## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RAIT FUNDING, LLC, a Delaware limited liability company, *et al.*[1] | Case No. 19-11915 (BLS) (Joint Administration Pending) |
| Debtors. | |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) CONTINUE TO OPERATE THEIR CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO, (C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM INTERCOMPANY TRANSACTIONS, (II) SUSPENDING THE REQUIREMENTS CONTAINED IN SECTION 345(b) OF THE BANKRUPTCY CODE, AND (III) GRANTING RELATED RELIEF

RAIT Funding, LLC and certain of its affiliates, the debtors and debtors in possession in the above-captioned chapter 11 proceedings (the "Debtors"), file this motion (this "Motion") for entry of an order under sections 105, 345, and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2015-2 and 4001-3 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), substantially in the form attached hereto as Exhibit A

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: RAIT Funding, LLC, a Delaware limited liability company (9983); RAIT Financial Trust, a Maryland real estate investment trust (9819); RAIT General, Inc., a Maryland corporation (9987); RAIT Limited, Inc., a Maryland corporation (9773); Taberna Realty Finance Trust, a Maryland real estate investment trust (3577); RAIT JV TRS, LLC, a Delaware limited liability company (3190); and RAIT JV TRS Sub, LLC, a Delaware limited liability company (4870).  The mailing address for all Debtors is Two Logan Square, 100 N. 18th Street, 23rd Floor, Philadelphia, Pennsylvania 19103 (Attn: John J. Reyle).

(the "Proposed Order"),[2] (i) authorizing the Debtors to (a) continue to operate their cash management system, illustrated on Exhibit 1 to the Proposed Order (the "Cash Management System"), (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to perform intercompany transactions consistent with historical practice, (ii) suspending the requirements contained in section 345(b) of the Bankruptcy Code, and (iii) granting related relief.  In support of this Motion, the Debtors rely upon the *Declaration of John J. Reyle in Support of Chapter 11 Petitions and First-Day Relief* (the "First-Day Declaration"), which was filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION; VENUE

1.      The Court has jurisdiction over these chapter 11 cases and this Motion under 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  The Motion is a core matter under 28 U.S.C. § 157(b), and the Court may enter a final order consistent with Article III of the United States Constitution.[3]

2.      Venue of these chapter 11 cases and this Motion is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

---

[2] The Proposed Order attached is an interim order that includes a deadline for any objections to the relief in the Proposed Order becoming final, and a hearing for any such objection(s).  The Proposed Order further provides that if no objections are filed, the Court may enter a final order without a hearing.

[3] The Debtors consent to entry of a final order by this Court if it is determined that the Court, absent consent of the parties, cannot enter a final order consistent with Article III of the United States Constitution.

117709643.10

3.     The statutory and procedural predicates for the relief requested herein are sections 105, 345, and 363 of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rules 2015-2 and 4001-3.

## GENERAL BACKGROUND

4.     The Debtors are internally-managed real estate investment organizations that manage a portfolio of commercial real estate loans and properties.  The Debtors conduct their business through one reportable segment, their real estate lending, owning, and managing segment.  This segment is concentrated on lending, owning, and managing commercial real estate assets throughout the United States.

5.     On August 30, 2019 (the "Petition Date"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no official committee of unsecured creditors has been appointed and no request for appointment of a chapter 11 trustee or examiner has been made.

6.     Additional information regarding the Debtors' history and business operations, their capital structure, and the events leading up to the commencement of these chapter 11 cases are set forth in the First-Day Declaration.  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the First-Day Declaration.

7.     As set forth in the First-Day Declaration, prior to filing their bankruptcy petitions, Debtors RAIT Financial Trust, RAIT General, RAIT Limited, and Taberna (collectively, the "Sellers"), on the one hand, and CF RFP Holdings LLC, an entity owned by funds managed by affiliates of Fortress Investment Group LLC (the "Stalking Horse Purchaser"), on the other hand,

3

entered into a certain Equity and Asset Purchase Agreement (the "Stalking Horse Purchase Agreement"), pursuant to which the Stalking Horse Purchaser will acquire, directly or indirectly substantially all of the Sellers' assets, for the cash purchase price of approximately $174.4 million (subject to certain adjustments set forth in the Stalking Horse Purchase Agreement), free and clear of all liens, claims, encumbrances and interests (the "Sale Transaction").  The Sale Transaction will be subject to higher and better offers pursuant to certain bidding procedures the Debtors will present to this Court for approval by subsequent motion.

8.       Also as set forth in the First-Day Declaration, as of the date hereof, certain Debtors have entered into Restructuring and Plan Support Agreements with the holders of the Junior Subordinated Notes (the "RAIT RSAs").  The counterparties to the RAIT RSAs have agreed to serve as impaired accepting classes of creditors and support the restructuring of the Debtors' indebtedness and other obligations and interests which, subject to the consummation of the Sale Transaction and confirmation of a chapter 11 plan consistent with the RAIT RSAs, would result in all other creditors of the Debtors, including the holders of the 7.125% Senior Notes, the holders of the 7.625% Senior Notes, and all administrative, priority and general unsecured claims, receiving payment in full, in cash of their allowed claims.  The Debtors intend to pursue a chapter 11 plan process consistent with the RAIT RSAs on parallel track with their sale process, so as to minimize the time and expense associated with the chapter 11 process

## RELEVANT BACKGROUND

### I.       Overview.

9.       The Debtors maintain the Cash Management System, which comprises a total of eight (8) bank accounts, each of which is identified on Exhibit 2 to the Proposed Order (collectively, the "Bank Accounts").  The Bank Accounts reside at the following banks:

4

Citibank and Wilmington Trust (collectively, the "Cash Management Banks").  As described below, the Debtors maintain three operating accounts, two money market accounts,[4] and two escrow accounts.

10.    The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of a consolidated corporation with a number of operating subsidiaries in a cost-effective, efficient manner.  The Debtors use the Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors have used the Cash Management System without substantial modification since at least 2015.

11.    The Debtors' Finance and Accounting department manages the Bank Accounts, including the opening, closing, and day-to-day maintenance of concentration, demand deposit, controlled disbursement, and interest-bearing deposit accounts.  The Debtors' accounting department performs monthly reconciliations of Bank Account information to the Debtors' general ledger to ensure that all cash activities are accounted for properly.

**II.    Bank Accounts.**

12.    The Bank Accounts are described in the following table:

---

[4] The Debtors intend to file a notice in compliance with Local Rule 4001-3 with respect to the money market accounts.

117709643.10

| Category | Description |
|---|---|
| RAIT Financial Trust<br><br>Operating Account<br><br>(2169) | Main operating account.<br><br>This account receives distributions from its Debtor and non-Debtor subsidiaries including: i) principal & interest receipts from securitization bonds; ii) operating income from real estate properties; iii) servicing & collateral management fees; iv) tax refunds; v) miscellaneous income such as bad debts collected; and vi) other distributions from its subsidiaries as needed.<br><br>This account disburses funds for the principal business activities of RAIT Financial Trust and its Debtor and non-Debtor subsidiaries including: i) payroll & benefits; ii) debt service on recourse indebtedness (its own and its subsidiaries); iii) funding operating and capital expenditure needs for its real estate properties; iv) G&A expenditures (its own and its subsidiaries); v) income tax payments (its own and its subsidiaries); vi) dividend payments (its own and its subsidiaries); and vii) other contributions to its subsidiaries as needed.<br><br>Generally, receipts from securitization bonds, operating income from real estate properties and servicing & collateral management fees are received once per month. Other amounts are received on an ad hoc basis.<br><br>Generally, payroll & benefits are processed twice per month.  Debt service on recourse indebtedness is processed as it becomes due (generally, quarterly). Generally, funding for real estate properties is processed once per month. Generally, G&A expenditures are processed once per week (in addition, certain expenses may be processed on an ad hoc basis). Other disbursements are processed on an ad hoc basis. |
| RAIT Financial Trust<br><br>Money Market Accounts<br><br>(1136)<br><br>(0232) | Debtor RAIT Financial Trust maintains two money market accounts.<br><br>Account 1136 is primarily used to transfer payments related to RAIT Financial Trust's lending business that occur outside of its securitizations.  These transfers primarily occur between Debtor RAIT Financial Trust and its non-Debtor subsidiary that performs its loan servicing functions.<br><br>This account receives interest earnings on the account itself and also receives distributions from its non-Debtor loan servicing subsidiary including: i) principal & interest receipts from loans held outside of securitizations, including loan participations; and ii) fees earned related to those loans.<br><br>This account disburses funds via transfer, generally only to account 2169, as needed for RAIT Financial Trust's general operations and also disburses funds to Debtor RAIT Financial Trust's non-Debtor loan servicing subsidiary including: i) protective servicing advances; and ii) principal and/or interest payments related to loan participations.<br><br>Generally, receipts occur on an ad hoc basis, but generally only occur once per month per loan.<br><br>Generally, disbursements occur on an ad hoc basis, but generally only occur once per month per loan.<br><br>Account 0232 is used as a simple money market account. Excess operating funds are transferred into this account to earn interest.<br><br>This account receives interest earnings on the account itself.<br><br>This account disburses funds via transfer, generally only to account 2169, as needed for RAIT Financial Trust's general operations.<br><br>These receipts and disbursements occur on an ad hoc basis (disbursements are limited to 6x/month in accordance with the terms of the account). |

6

| Category | Description |
|---|---|
| RAIT Financial Trust Escrow Account (4000) | Debtor RAIT Financial Trust maintains one escrow account. This account receives principal and interest payments on securitization bonds owned by certain non-Debtor subsidiaries of RAIT Financial Trust. Generally, these receipts occur once per month (upon the processing the related securitization's waterfall). This account disburses funds via transfer to account 2169. Generally, these transfers occur via an automatic sweep each Friday and on the last day on every month. |
| Taberna Realty Finance Trust ("Taberna") Operating Account (0397) | Debtor Taberna maintains this account as its main operating account. This account receives principal & interest receipts from its investments in loans. Generally, receipts occur on an ad hoc basis, but generally only occur once per month per loan. This account disburses funds via transfer to its Parent (Debtor RAIT Financial Trust), generally only to account 2169, as needed for RAIT Financial Trust's general operations; and also may disburse funds for Taberna's general obligations. Generally, disbursements occur on an ad hoc basis. |
| Taberna Escrow Account (9000) | Debtor Taberna maintains one escrow account. This account receives principal and interest payments on securitization bonds owned by Debtor Taberna. Generally, these receipts occur once per month (upon the processing the related securitization's waterfall). This account disburses funds via transfer to account 0397. Generally, these transfers occur via an automatic sweep each Friday and on the last day on every month. |
| RAIT Funding Operating Account (5657) | Debtor RAIT Funding maintains this account as its main operating account. This account currently does not receive or disburse any funds. If it received any funds, those would occur via transfer from its ultimate Parent (Debtor RAIT Financial Trust), generally from account 2169.  If it made any disbursements, those would occur to satisfy any of its general obligations. Debtor RAIT Funding has no material assets. |
| RAIT JV TRS Operating Account (9356) | Debtor RAIT JV TRS maintains this account as its main operating account. This account currently does not receive any funds.   If it made any disbursements, those would occur to satisfy any of its general obligations including any required tax payments or those of its subsidiary, another debtor, RAIT JV TRS Sub. Debtor RAIT JV TRS has no material assets. |

13.     The Debtors pay certain of the Cash Management Banks and other vendors approximately $3,500 per month in the aggregate, on account of fees incurred in connection with the administration of the Cash Management System (the "Bank Fees").  The Debtors estimate that they owe approximately $12,600.00 on account of Bank Fees as of the Petition Date, all of which will become due and payable within 45 days of the Petition Date.

**III.     The Cash Management Banks' Compliance with the U.S. Trustee Guidelines.**

14.     The Debtors maintain a total of eight (8) accounts at 2 bank(s), each of which is designated as an authorized depository by the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines").  The Bank Accounts are insured by the Federal Deposit Insurance Corporation (the "FDIC") up to the applicable limit of $250,000 per account.  If the Debtors open any new accounts during these cases, the Debtors will do so at institutions that are designated as authorized depositories by the U.S. Trustee Guidelines.

**IV.     Business Forms.**

15.     As part of the Cash Management System, the Debtors utilize numerous preprinted business forms (the "Business Forms") in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and business forms (including, without limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of

ordering entirely new business forms as might otherwise be required under the U.S. Trustee Guidelines.  To the extent the Debtors print any new checks, they will include the designation "Debtor in Possession" and the corresponding bankruptcy case number.

## V.    Intercompany Transactions.

16.    The Debtors maintain business relationships with each other and certain non-debtor affiliates.  The company is treated for accounting purposes on a consolidated basis. Accordingly, transfers are frequently conducted among the Debtors and non-debtor affiliates pursuant to informal arrangements ("Intercompany Transactions").  More specifically, Debtor RAIT Financial Trust has historically supported the enterprise by payment on behalf of both other Debtors and non-debtor affiliates of general and administrative expenses, income taxes, and dividends.  RAIT Financial Trust has also historically paid interest on recourse debt obligations of Debtors Taberna and RAIT Funding.[5]

17.    Further, Debtor RAIT Financial Trust indirectly owns real property through its non-debtor special purpose entity subsidiaries ("SPEs").  The SPEs routinely require funding from time to time to make improvements to the real properties, pay leasing costs, and pay certain operating and administrative costs related to the real properties, which may be funded by RAIT Financial Trust.  The contributions to the SPE may subsequently be returned as a distribution in the ordinary course of business either in the form of operating income generated by the property, sale proceeds when the property is sold, or both.

18.    As the ultimate parent of the enterprise, RAIT Financial Trust's payments are equity contributions, and repayments are distributions.  The process is the central mechanism by

---

[5] To be clear, the Debtors are not seeking authority for any Intercompany Transaction that would result in the payment of a prepetition claim against a Debtor entity, unless such payment had been independently authorized by another order of this Court.

which the Debtors and their non-debtor affiliates operate their business.  The system is critical to the Debtors' continued operations.

19.     The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all equity contributions and disbursements.  The Debtors, with the assistance of M-III Advisory Partners, LP ("M-III"),[6] have also put in place monitoring systems to be able to track post-petition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.[7]

## RELIEF REQUESTED

20.     By this Motion, the Debtors seek entry of an order, substantially in the form of the Proposed Order, (i) authorizing the Debtors to (a) continue to operate the Cash Management System, (b) honor certain prepetition obligations related thereto, (c) maintain existing business forms, and (d) continue to perform Intercompany Transactions consistent with historical

---

[6] The Debtors will request authority to retain M-III to provide restructuring services by subsequent application to the Court.

[7] This Motion provides an overview of the Debtors' typical Intercompany Transactions.  The relief requested herein is applicable with respect to all Intercompany Transactions and is not limited to those Intercompany Transactions described in this Motion.  To the extent that there are any outstanding prepetition obligations related to Intercompany Transactions not described herein, the Debtors, out of an abundance of caution, seek authority to honor such obligations.

practice,[8] (ii) suspending the requirements contained in section 345(b) of the Bankruptcy Code,

and (iii) granting related relief.

## BASIS FOR RELIEF REQUESTED

I.    **Maintaining the Existing Cash Management System Is Essential to the Debtors' Ongoing Operations and Restructuring Efforts.**

21.    The U.S. Trustee Guidelines require debtors in possession to, among other things:

   a.  establish one debtor-in-possession bank account for all estate monies required for the payment of taxes, including payroll taxes;

   b.  close all existing bank accounts and open new debtor-in-possession accounts; and

   c.  obtain checks that bear the designation "debtor in possession" and reference the bankruptcy case number and type of account on such checks.

22.    These requirements are designed to provide a clear line of demarcation between

prepetition and post-petition claims and payments and to help protect against the inadvertent

payment of prepetition claims by preventing banks from honoring checks drawn before the

Petition Date.  Considering, however, that the Debtors' business and financial affairs are

complex and require the collection, disbursement, and movement of funds through their eight (8)

Bank Accounts, enforcement of this provision of the U.S. Trustee Guidelines during these

chapter 11 cases would severely disrupt, if not cripple, the Debtors' operations.  Accordingly, the

Debtors respectfully request that the Court allow them to operate each of the Bank Accounts

---

[8] Because the Debtors engage in Intercompany Transactions (as defined herein) on a regular basis and such transactions are common among similar enterprises, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the Bankruptcy Code and, therefore, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a post-petition basis.  The continued performance of the ordinary course Intercompany Transactions is necessary to ensure the Debtors' ability to operate their business during these chapter 11 cases.

117709643.10

listed on Exhibit 2 to the Proposed Order as such were maintained in the ordinary course of business before the Petition Date.

23.     Continuation of the Cash Management System is permitted pursuant to section 363(c)(1) of the Bankruptcy Code, which authorizes the debtor in possession to "use property of the estate in the ordinary course of business without notice or a hearing."  Additionally, courts in this and other districts have recognized that an integrated cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash."  *In re Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *aff'd in part and rev'd in part on other grounds*, 997 F.2d 1039 (3d Cir. 1993), *cert. denied sub nom., Official Committee of Unsecured Creditors v. Columbia Gas Transmission Corp.,* 510 U.S. 1110 (1994).  The United States Court of Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain separate accounts "would be a huge administrative burden and economically inefficient."  *Columbia Gas*, 997 F.2d at 1061; *accord In re Southmark Corp.*, 49 F.3d 1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer more efficiently and effectively its financial operations and assets").

## II.     Maintaining the Existing Cash Management Systems Will Not Harm Parties in Interest.

24.     Continued use of the Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system and minimizing delays in the payment of post-petition obligations.  The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the Cash Management System, including maintenance of the Bank Accounts and the Intercompany Transactions, because the Debtors have implemented

117709643.10

appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred before the Petition Date.

25.     Specifically, with the assistance of their advisors, the Debtors have implemented internal control procedures that prohibit payments on account of prepetition debts of any Debtor without the prior approval of both the Court and the Debtors' Finance and Accounting department.

26.     Continuation of the Debtors' funding and repayment practices will benefit the Debtors' creditors and other stakeholders.  Section 345(a) of the Bankruptcy Code provides:

> A trustee in a case under this title may make such deposit or investment of the money of the estate for which such trustee serves as will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment.

11 U.S.C. § 345.  Here, continuation of the Debtors' investment and distribution system will benefit the estates by enabling the Debtors' business to continue uninterrupted.  In contrast, interruption of the Debtors' funding practices will harm or even cripple the enterprise.  The Debtors submit that maintaining the Cash Management System is in the best interests of their estates and creditors.

## III.     Authorizing the Debtors to Continue Using Debit, Wire, Credit Card, and ACH Payments Is Warranted.

27.     The Debtors request that the Court grant further relief from the U.S. Trustee Guidelines to the extent they require the Debtors to make all disbursements by check.  In particular, the U.S. Trustee Guidelines require that all receipts and all disbursements of estate funds must be made by check with a notation representing the reason for the disbursement.  As discussed above, in the ordinary course of business, the Debtors conduct transactions through ACH transfers, wire transfers, and other similar methods.  In addition, a certain percentage of the

Debtors' receipts are received through wire transfer payments.  If the Debtors' ability to conduct

transactions by debit, wire, ACH transfer, or other similar methods—including their ability to

pay associated fees—is impaired, the Debtors may be unable to perform under certain contracts,

their business operations may be unnecessarily disrupted, and their estates will incur additional

costs.

### IV.    Authorizing the Banks to Continue to Maintain, Service, and Administer the Bank Accounts in the Ordinary Course of Business Is Warranted.

28.    As discussed above, implementing the U.S. Trustee Guidelines would needlessly

interrupt the Debtors' operations and impair the Debtors' efforts to preserve the value of their

estates and reorganize in an efficient manner.  Thus, the Debtors respectfully request that the

Court authorize the banks to continue to maintain, service, and administer the Bank Accounts as

accounts of the Debtors as debtors in possession, without interruption and in the ordinary course

of business.  In this regard, the banks should be authorized to receive, process, honor, and pay

any and all checks, ACH transfers and other instructions, and drafts payable through, drawn on,

or directed to such Bank Accounts after the Petition Date by holders, makers, or other parties

entitled to issue instructions with respect thereto; provided, that any check, draft, or other

notification that the Debtors advise the banks to have been drawn, issued, or otherwise presented

before the Petition Date may be honored by the banks only to the extent authorized by order of

the Court.

29.    The Debtors further request that the Court authorize the banks to accept and honor

all representations from the Debtors as to which checks, drafts, wires, or ACH transfers should

be honored or dishonored consistent with any order of the Court and governing law, whether

such checks, drafts, wires, or ACH transfers are dated before, on, or after the Petition Date.  The

Debtors also request that, to the extent a bank honors a prepetition check or other item drawn on

any account either (a) at the direction of the Debtors, or (b) in a good-faith belief that the Court

has authorized such prepetition check or item to be honored, such bank will not be deemed to be

liable to the Debtors or to their estates on account of such prepetition check or other item

honored post-petition.  The Debtors respectfully submit that such relief is reasonable and

appropriate because the banks are not in a position to independently verify or audit whether a

particular item may be paid in accordance with a Court order or otherwise.

30.     Moreover, the Debtors request that the Court authorize the banks to (i) continue to

charge the Debtors the Bank Fees, as applicable, and (ii) charge-back returned items to the Bank

Accounts, whether such items are dated before, on, or after the Petition Date, in the ordinary

course of business.

**V.     The Court Should Authorize the Debtors to Continue Using Their Existing Business Forms.**

31.     To avoid disruption of the Cash Management System and unnecessary expense,

pursuant to Local Rule 2015-2(a), the Debtors request that they be authorized to continue to use

their business forms substantially in the form existing immediately before the Petition Date,

without reference to their status as debtors in possession.  The Debtors submit that parties in

interest will not be prejudiced if the Debtors are authorized to continue to use their business

forms substantially in the forms existing immediately before the Petition Date.  Parties doing

business with the Debtors undoubtedly will be aware of their status as debtors in possession and,

thus, changing business forms is unnecessary and would be unduly burdensome.  In accordance

with Local Rule 2015-2(a), the Debtors will include the designation "Debtor in Possession" and

the corresponding bankruptcy case number on checks that they print during these chapter 11

cases.

117709643.10

**VI.    Cause Exists to Suspend Section 345 of the Bankruptcy Code with Respect to the Debtors' Deposit Practices.**

32.    Section 345(a) of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment."  For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345 requires debtors to obtain, from the entity with which the money is deposited, a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, or "the deposit of securities of the kind specified in section 9303 of title 31," unless the Court "for cause" orders otherwise.  11 U.S.C. § 345(a)–(b).

33.    The Debtors believe that they are in substantial compliance with the requirements of section 345(b) of the Bankruptcy Code because all of the Bank Accounts are presently FDIC-insured (up to the applicable limit of $250,000 per account) and maintained with an authorized depository.  But out of abundance of caution, the Debtors submit that cause exists to excuse the Debtors from the strictures of Section 345(b) of the Bankruptcy Code.

34.    The term "for cause" was added to the statute in 1994 to permit a bankruptcy court to excuse a large, sophisticated debtor such as the Debtors from the mandatory requirements of Section 345(b).  The legislative history states that the amendment was intended to overrule *In re Columbia Gas Systems, Inc.*, 33 F.3d 294 (3d Cir. 1994).  In that case, the Third Circuit Court of Appeals found that the pre-amendment provisions of § 345(b) were mandatory and could not be modified or waived by the court.  The Congressional Record contains the following explanatory comments with regard to why the statute was amended:

> Section 345 of the Code governs investments of the funds of bankruptcy estates. The purposes is to make sure that the funds of a

16

bankrupt (sic) that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankrupt estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, **it can work to needlessly handcuff larger, more sophisticated debtors**. This section would amend the Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling *In re Columbia Gas Systems, Inc*., 33 F.3d 294, 1994 WL 463514 (3d Cir. Del.).

H.R. Rep. 103–834H.R. Rep. 103–834, 103rd Cong., 2nd Sess. 224 (Oct. 4, 1994); 140 Cong. Rec. H10767 (Oct. 4, 1994) (emphasis added).

35.    When deciding whether cause exists to excuse a debtor from the requirements of Section 345(b), a court should review the totality of circumstances, with focus on the following factors:

1. The sophistication of the debtor's business;

2. The size of the debtor's business operations;

3. The amount of investments involved;

4. The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor-in-possession funds are held;

5. The complexity of the case;

6. The safeguards in place within the debtor's own business of insuring the safety of the funds;

7. The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

8. The benefit to the debtor;

9. The harm, if any, to the estate; and

10. The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*In re Serv. Merch. Co., Inc.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

36.    The majority of the above factors weigh in favor of excusing the Debtors from the strictures of Section 345(b).  The Debtors' business is large, complex and sophisticated, and not

17

the simple depository situation Section 345(b) was designed to address.  The two banks at issue

(Citibank and Wilmington Trust) are household names in banking and bring little risk of failure.

The Debtors' investments are large (in excess of $35 million), and obtaining one or more bonds

would be unduly burdensome on these bankruptcy estates.  Conversely, the Debtors and their

estates would greatly benefit from being excused from obtaining additional security.  While the

Debtors admit their ability to reorganize would be greatly jeopardized if Citibank or Wilmington

Trust were to fail, the Debtors submit that their request to be excused from the requirements of

Section 345(b) is reasonable given the overall circumstances in this case.

37.     The Debtors request a 30-day suspension of the requirements of section 345(b) of

the Bankruptcy Code, to the extent necessary, pursuant to Local Rule 2015-2(b) and without

prejudice to the Debtors to seek additional extensions.  Local Rule 2015-2(b) provides that

> [e]xcept as provided in Local Rule 4001-3, no waiver of the
> requirements of 11 U.S.C. § 345 shall be granted by the Court
> without notice and an opportunity for hearing in accordance with
> these Local Rules.  However, if a motion for such waiver is filed on
> the first day of a chapter 11 case in which there are more than 200
> creditors, the Court may grant an interim waiver until a hearing on
> the debtor's motion can be held.

Del. Bankr. L.R. 2015-2(b).

38.     Further, the Debtors propose (and the Proposed Order provides) that a final

hearing be set with respect to the relief in Proposed Order becoming final, at which any

objections and responses may be heard, including any objections to the suspension described

above.

39.     Accordingly, pursuant to section 345 of the Bankruptcy Code and Local Rule

2015-2(b), the Debtors request a 30-day suspension of the deposit requirements of section 345 of

the Bankruptcy Code, and without prejudice to the Debtors to seek additional extensions.

117709643.10

**VII.    The Court Should Authorize the Debtors to Continue Conducting Intercompany Transactions in the Ordinary Course and Grant Administrative Priority Status to Post-petition Intercompany Claims.**

40.    The Debtors' funds move through the Cash Management System as described above.  Intercompany Transactions are made between and among Debtor and non-Debtor affiliates in the ordinary course as part of the Cash Management System.  The Debtors track all fund transfers in their accounting system and can ascertain, trace, and account for all Intercompany Transactions previously described.  The Debtors, moreover, will continue to maintain records of such Intercompany Transactions.  If the Intercompany Transactions were to be discontinued, the Cash Management System, the related administrative controls, and the shared services provided by RAIT Financial Trust would be disrupted to the Debtors' and their estates' detriment.

41.    Accordingly, the Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

42.    To the extent that these transactions could be construed as extensions of intercompany credit made in the ordinary course of business, the Debtors respectfully request the authority to continue conducting the Intercompany Transactions in the ordinary course of business without need for further order of the Court, as they are an essential component of the Cash Management System.  To be clear, the Debtors are not seeking to assume any executory contracts related to the Intercompany Transactions at this time.

43.    To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another Debtor entity, the Debtors respectfully request, pursuant to section 503(b)(1) of the Bankruptcy Code, that all post-petition payments between or among a Debtor and another Debtor on account of an Intercompany Transaction be accorded administrative

expense status.  This relief will ensure that each payee-Debtor's estate will continue to bear ultimate repayment responsibility for such ordinary course transactions, thereby reducing the risk that these transactions would jeopardize the recoveries available to each Debtor's respective creditors.

### THE REQUIREMENTS OF BANKRUPTCY RULE 6003 ARE SATISFIED

44.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed herein, authorizing the Debtors to (i) continue to operate the Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms, (iv) continue to perform Intercompany Transactions consistent with historical practice, and (v) suspend the requirements contained in section 345(b) of the Bankruptcy Code, and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would disrupt the Debtors' operations at this critical juncture.  The relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein, to the extent applicable.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

45.     To implement the foregoing successfully, the Debtors seek a waiver of the notice

requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use,

sale, or lease of property under Bankruptcy Rule 6004(h), to the extent applicable to this Motion.

## RESERVATION OF RIGHTS

46.     Nothing contained in this Motion or any actions taken by the Debtors pursuant to

relief granted in the Proposed Order is intended or should be construed as:  (a) an admission as to

the validity of any particular claim against a Debtor entity; (b) a waiver of the Debtors' rights to

dispute any particular claim on any grounds; (c) a promise or requirement to pay any particular

claim; (d) an implication or admission that any particular claim is of a type specified or defined

in this Motion; (e) a request or authorization to assume any agreement, contract, or lease

pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights

under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that

any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to this Motion are

valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection,

or to seek avoidance, of all such liens.  If the Court grants the relief sought herein, any payment

made pursuant to the Court's order is not intended and should not be construed as an admission

as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently

dispute such claim.

## NOTICE

47.     The Debtors will provide notice of this Motion to: (i) the Office of the United

States Trustee; (ii) the entities appearing on the Debtors' list of twenty (20) largest unsecured

creditors on a consolidated basis; (iii) counsel to the Stalking Horse Purchaser; (iv) the Securities

21

and Exchange Commission; (v) the Internal Revenue Service; (vi) the Delaware Secretary of

State; (vii) the Cash Management Banks; and (viii) those persons who have formally appeared in

these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002.  Notice of this

Motion and any order with respect hereto will be served in accordance with Local Rule 9013-

1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or

further notice is necessary under the circumstances.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit A, granting the relief requested herein and

providing the Debtors such other and further relief as is just and proper.

Dated: Wilmington, Delaware
      September 2, 2019

**DRINKER BIDDLE & REATH LLP**

*/s/ Patrick A. Jackson*
Patrick A. Jackson (Del. Bar No. 4976)
Joseph N. Argentina, Jr. (Del. Bar No. 5453)
222 Delaware Avenue, Suite 1410
Wilmington, DE 19801
Tel:  (302) 467-4200
Fax: (302) 467-4201
Patrick.Jackson@dbr.com
Joseph.Argentina@dbr.com

-and-

Michael P. Pompeo (*pro hac vice* pending)
Brian P. Morgan (*pro hac vice* pending)
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Tel:  (212) 248-3140
Fax:  (212) 248-3141
Michael.Pompeo@dbr.com
Brian.Morgan@dbr.com

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

## **EXHIBIT A**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| RAIT FUNDING, LLC,<br>a Delaware limited liability company, *et al.*[1] | Case No. 19-11915 (BLS)<br>(Joint Administration Pending) |
| Debtors. | **Ref. Docket No. __** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO
(A) CONTINUE TO OPERATE THE CASH MANAGEMENT SYSTEM,
(B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED THERETO,
(C) MAINTAIN EXISTING BUSINESS FORMS, AND (D) CONTINUE TO PERFORM
INTERCOMPANY TRANSACTIONS, (II) SUSPENDING THE REQUIREMENTS
CONTAINED IN SECTION 345(b) OF THE BANKRUPTCY CODE
AND (III) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "<u>Motion</u>")[2] filed by the above-captioned Debtors

for the entry of an order authorizing the Debtors to continue to operate their Cash Management

System, and granting related relief; and upon consideration of the First-Day Declaration; and it

appearing that (i) the Court has jurisdiction over these chapter 11 cases and the Motion under 28

U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United

States District Court for the District of Delaware dated as of February 29, 2012, (ii) venue of

these chapter 11 cases and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409,

(iii) the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter a

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: RAIT Funding, LLC, a Delaware limited liability company (9983); RAIT Financial Trust, a Maryland real estate investment trust (9819); RAIT General, Inc., a Maryland corporation (9987); RAIT Limited, Inc., a Maryland corporation (9773); Taberna Realty Finance Trust, a Maryland real estate investment trust (3577); RAIT JV TRS, LLC, a Delaware limited liability company (3190); and RAIT JV TRS Sub, LLC, a Delaware limited liability company (4870). The mailing address for all Debtors is Two Logan Square, 100 N. 18th Street, 23rd Floor, Philadelphia, Pennsylvania 19103 (Attn: John J. Reyle).

[2] Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

1

117709643.10

final order consistent with Article III of the United States Constitution, and (iv) notice of the

Motion was adequate and proper under the circumstances, and no other or further notice need be

given; and the Court having held a hearing to consider the relief requested in the Motion; and

upon the record of the hearing and all of the proceedings had before this Court; and it appearing

that the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors, and all other parties in interest, and that the legal and factual bases set forth in the

Motion establish just cause for the relief granted herein; and after due deliberation and sufficient

cause appearing therefor, it is hereby ORDERED THAT:

1.     The Motion is GRANTED on an interim basis as set forth herein.

2.     The requirements and the effect of Section 345 of the Bankruptcy Code are

suspended for a period of thirty (30) days from the date of this Order without prejudice to the

Debtors seeking a further suspension.

3.     The Debtors are authorized, but not directed, to:  (a) continue operating the Cash

Management System, substantially as identified on Exhibit 1 attached hereto and as described in

the Motion; (b) honor their prepetition obligations related thereto; (c) maintain existing business

forms; and (d) continue to perform Intercompany Transactions consistent with historical practice.

4.     The Debtors are further authorized to: (a) continue to use, with the same account

numbers, the Bank Accounts in existence as of the Petition Date, including those accounts

identified on Exhibit 2 attached hereto; (b) use, in their present form, all correspondence and

business forms (including letterhead, purchase orders, and invoices), as well as checks and other

documents related to the Bank Accounts existing immediately before the Petition Date, without

reference to the Debtors' status as debtors in possession; (c) treat the Bank Accounts for all

purposes as accounts of the Debtors as debtors in possession; (d) deposit funds in and withdraw

2

funds from the Bank Accounts by all usual means, including checks, wire transfers, and other

debits; (e) pay the prepetition Bank Fees; and (f) pay any ordinary course bank fees incurred in

connection with the Bank Accounts, and to otherwise perform their obligations under the

documents governing the Bank Accounts.  To the extent the Debtors print any new checks, they

will include the designation "Debtor in Possession" and the corresponding bankruptcy case

number.

5.      All banks at which the Bank Accounts are maintained are authorized to continue

to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in

possession, without interruption and in the ordinary course and in a manner consistent with

prepetition practices, and to receive, process, honor, and pay, to the extent of available funds,

any and all checks, drafts, wires, credit card payments, and ACH transfers issued and drawn on

the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be.

6.      All banks provided with notice of this Order maintaining any of the Bank

Accounts shall not honor or pay any bank payments drawn on the listed Bank Accounts or

otherwise issued before the Petition Date for which the Debtors specifically issue stop payment

orders in accordance with the documents governing such Bank Accounts.

7.      The Debtors' credit card processors are authorized to process payments in the

ordinary course of business, including the netting out of any fees and/or chargebacks whether

arising before or after the Petition Date.

8.      In the course of providing cash management services to the Debtors, each of the

banks at which the Bank Accounts are maintained is authorized, without further order of this

Court and consistent with prepetition practices, to deduct the applicable fees (whether arising

prior to or after the Petition Date) from the appropriate accounts of the Debtors, and further, to

3

charge back to the appropriate accounts of the Debtors any amounts resulting from returned checks or other returned items, including returned items that result from ACH transactions, wire transfers, or other electronic transfers of any kind, regardless of whether such items were deposited or transferred prepetition or post-petition and regardless of whether the returned items relate to prepetition or post-petition items or transfers.  Any such fees arising after the Petition Date that are charged by the Banks consistent with established practice are entitled to administrative expense priority status pursuant to section 503(b) of the Bankruptcy Code.

9.      Notwithstanding any other provision of this Order, any bank may rely upon the representations of the Debtors, without a duty of inquiry, with respect to whether any check, draft, wire, or other transfer drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to any order of this Court (but such check, draft, wire or other transfer shall only be honored to the extent of available funds), and no bank that honors a prepetition check or other item drawn on any account that is the subject of this Order (a) at the direction of the Debtors or (b) in a good-faith belief that this Court has authorized such prepetition check or item to be honored shall be deemed to be nor shall be liable to the Debtors or their estates or any other person or entity on account of such prepetition check or other item being honored post-petition, or otherwise deemed to be in violation of this Order.

10.     Any banks are further authorized to (a) honor the Debtors' directions with respect to the opening and closing of any Bank Account and (b) accept and hold, or invest, the Debtors' funds in accordance with the Debtors' instructions; provided that the Debtors' banks shall not have any liability to any person or entity for relying on such representations to the extent such banks' actions otherwise comply with applicable law.

4

11.     The Debtors are authorized to open any new Bank Accounts or close any existing Bank Accounts as it may deem necessary and appropriate in their sole discretion; provided, however, that the Debtors give notice within fifteen (15) days to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee's Office") and any statutory committees appointed in these chapter 11 cases; provided, further, however that the Debtors shall open any such new Bank Account at banks that have executed a Uniform Depository Agreement with the Office of the United States Trustee for the District of Delaware, or at such banks that are willing to immediately execute such an agreement.

12.     For banks at which the Debtors hold Bank Accounts that are party to a Uniform Depository agreement with the U.S. Trustee's Office, within fifteen (15) days of the date of entry of this Order, the Debtors shall (a) contact each bank, (b) provide the bank with each of the Debtors' employer identification number and (c) identify each of their Bank Accounts held at such banks as being held by a debtor in possession in a bankruptcy case, and provide the case number.

13.     For banks at which the Debtors hold accounts that are not party to a Uniform Depository agreement with the U.S. Trustee's Office, the Debtors shall use their good-faith efforts to cause the banks to execute a Uniform Depository agreement in a form prescribed by the U.S. Trustee's Office within thirty (30) days of the date of this Order. The U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

14.     Absent further Order of this Court, the Debtors shall not hold funds in excess of the FDIC insurance amounts at any Bank Account held at a bank that is not party to a Uniform Depository Agreement with the U.S. Trustee's Office.

15.     The requirement to establish separate accounts for cash collateral and/or tax payments is hereby waived.

16.     Notwithstanding anything to the contrary set forth herein, the Debtors are authorized to continue Intercompany Transactions arising from or related to the operation of their business in the ordinary course during these chapter 11 cases; provided that, for the avoidance of doubt, the Debtors shall not be authorized by this Order to undertake any Intercompany Transactions that are materially inconsistent with the Debtors' ordinary course practices during the prepetition period.  All post-petition payments from a Debtor under any post-petition Intercompany Transactions authorized hereunder are hereby accorded administrative expense status under section 503(b) of the Bankruptcy Code.  In addition, there shall be no intercompany loans from the Debtors to any non-debtors, absent further order of the Court; and each Debtor shall (a) continue to pay its own obligations consistent with such Debtor's past practice with respect to intercompany transfers and obligations, and (b) in no event shall any of the Debtors pay for the prepetition or post-petition obligations incurred or owed by any of the other Debtors in a manner inconsistent with past practices, and (c) implement accounting procedures to distinguish between prepetition and post-petition inter-debtor transactions.

17.     The Debtors shall maintain accurate and detailed records of all transfers, including Intercompany Transfers, so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and post-petition transactions.

117709643.10

18.     Despite use of a consolidated cash management system, the Debtors shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of who pays those disbursements.

19.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed: (a) an admission as to the validity of any claim against a Debtor entity; (b) a waiver of the Debtors' right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request or authorization to assume any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) a waiver or limitation of the Debtors' rights under the Bankruptcy Code or any other applicable law; or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) satisfied pursuant to the Motion are valid, and the Debtors expressly reserved their rights to contest the extent, validity, or perfection or seek avoidance of all such liens.

20.     A final hearing (the "Final Hearing") on the full relief requested in the Motion shall be held on _____, 2019 at _____ .m. (prevailing Eastern Time).  Any objections or responses to entry of a final order on the Motion (each, an "Objection") shall be filed on or before 4:00 p.m. prevailing Eastern Time on _____, 2019, and served on the following parties: (a) the Debtors, (b) proposed counsel for the Debtors, Drinker Biddle & Reath LLP, 1177 Avenue of the Americas, 41st Floor, New York, NY 10036-2714, Attn: Michael P. Pompeo, and 222 Delaware Avenue, Suite 1410, Wilmington, DE 19801, Attn: Patrick A. Jackson and Joseph N. Argentina, Jr.; (c) counsel for the Stalking Horse Purchaser, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038-4982, Attn: Daniel

P. Ginsberg, and Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, DE

19801, Attn: Matthew B. Lunn and Robert F. Poppiti, Jr., (d) the Office of the United States

Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lockbox 35, Wilmington, Delaware

19801 (Attn: Richard L. Schepacarter, Esquire); and (e) counsel to any official committee of

unsecured creditors appointed in this case.  In the event no Objections to entry of a final order on

the Motion are timely received, this Court may enter such final order without need for the Final

Hearing.

21.     The requirements of Bankruptcy Rule 6003(b) have been satisfied with respect to

the payments authorized by this Order.

22.     Notice of the Motion as provided therein shall be deemed good and sufficient

notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are

satisfied by such notice.

23.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order

are immediately effective and enforceable upon its entry.

24.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

25.     This Court shall retain jurisdiction with respect to all matters arising from or

related to implementation of this Order.

Dated: Wilmington, Delaware
      September ___, 2019       _____
                                      HON. BRENDAN LINEHAN SHANNON
                                      UNITED STATES BANKRUPTCY JUDGE

117709643.10

**Exhibit 1**

**Cash Management System Schematic**



Taberna Realty Finance Trust



| | | |
|---|---|---|
| Principal & interest receipts from loans | → | Citibank NA<br>xxxxxx0397<br>Taberna Realty Finance Trust<br>Operating account |

Transfers as needed to parent RAIT account x2169 for general operations

Obligations as needed

| | | |
|---|---|---|
| Principal & interest receipts from owned securitized bonds | → | Wilmington Trust<br>xxxx9000<br>Taberna Realty Finance Trust<br>Escrow account |

Automatic sweep each Friday and last day of each month*

*Recently began sweep to Taberna x0397.
Previously swept to RAIT Financial Trust x2169.

RAIT Funding LLC



Funding from RAIT Financial Trust account x2169 as needed → Citibank NA xxxxxx5657 RAIT Funding LLC Operating Account → Obligations as needed

RAIT JV TRS LLC



Funding from RAIT Financial Trust account x2169 as needed → Citibank NA xxxxxx9356 RAIT JV TRS LLC Operating Account → Tax payments and other obligations as needed

## Exhibit 2

## Bank Accounts

| Category | Description |
|---|---|
| RAIT Financial Trust<br><br>Operating Account<br><br>(2169) | Main operating account.<br><br>This account receives distributions from its Debtor and non-Debtor subsidiaries including: i) principal & interest receipts from securitization bonds; ii) operating income from real estate properties; iii) servicing & collateral management fees; iv) tax refunds; v) miscellaneous income such as bad debts collected; and vi) other distributions from its subsidiaries as needed.<br><br>This account disburses funds for the principal business activities of RAIT Financial Trust and its Debtor and non-Debtor subsidiaries including: i) payroll & benefits; ii) debt service on recourse indebtedness (its own and its subsidiaries); iii) funding operating and capital expenditure needs for its real estate properties; iv) G&A expenditures (its own and its subsidiaries); v) income tax payments (its own and its subsidiaries); vi) dividend payments (its own and its subsidiaries); and vii) other contributions to its subsidiaries as needed.<br><br>Generally, receipts from securitization bonds, operating income from real estate properties and servicing & collateral management fees are received once per month. Other amounts are received on an ad hoc basis.<br><br>Generally, payroll & benefits are processed twice per month.  Debt service on recourse indebtedness is processed as it becomes due (generally, quarterly). Generally, funding for real estate properties is processed once per month. Generally, G&A expenditures are processed once per week (in addition, certain expenses may be processed on an ad hoc basis). Other disbursements are processed on an ad hoc basis. |

| Category | Description |
|---|---|
| RAIT Financial Trust<br><br>Money Market Accounts<br><br>(1136)<br><br>(0232) | Debtor RAIT Financial Trust maintains two money market accounts.<br><br>Account 1136 is primarily used to transfer payments related to RAIT Financial Trust's lending business that occur outside of its securitizations.  These transfers primarily occur between Debtor RAIT Financial Trust and its non-Debtor subsidiary that performs its loan servicing functions.<br><br>This account receives interest earnings on the account itself and also receives distributions from its non-Debtor loan servicing subsidiary including: i) principal & interest receipts from loans held outside of securitizations, including loan participations; and ii) fees earned related to those loans.<br><br>This account disburses funds via transfer, generally only to account 2169, as needed for RAIT Financial Trust's general operations and also disburses funds to Debtor RAIT Financial Trust's non-Debtor loan servicing subsidiary including: i) protective servicing advances; and ii) principal and/or interest payments related to loan participations.<br><br>Generally, receipts occur on an ad hoc basis, but generally only occur once per month per loan.<br><br>Generally, disbursements occur on an ad hoc basis, but generally only occur once per month per loan.<br><br>Account 0232 is used as a simple money market account. Excess operating funds are transferred into this account to earn interest.<br><br>This account receives interest earnings on the account itself.<br><br>This account disburses funds via transfer, generally only to account 2169, as needed for RAIT Financial Trust's general operations.<br><br>These receipts and disbursements occur on an ad hoc basis (disbursements are limited to 6x/month in accordance with the terms of the account). |
| RAIT Financial Trust<br><br>Escrow Account<br><br>(4000) | Debtor RAIT Financial Trust maintains one escrow account.<br><br>This account receives principal and interest payments on securitization bonds owned by certain non-Debtor subsidiaries of RAIT Financial Trust.<br><br>Generally, these receipts occur once per month (upon the processing the related securitization's waterfall).<br><br>This account disburses funds via transfer to account 2169.<br><br>Generally, these transfers occur via an automatic sweep each Friday and on the last day on every month. |

| Category | Description |
|---|---|
| Taberna Realty Finance Trust ("Taberna") Operating Account (0397) | Debtor Taberna maintains this account as its main operating account. <br><br> This account receives principal & interest receipts from its investments in loans. <br><br> Generally, receipts occur on an ad hoc basis, but generally only occur once per month per loan. <br><br> This account disburses funds via transfer to its Parent (Debtor RAIT Financial Trust), generally only to account 2169, as needed for RAIT Financial Trust's general operations; and also may disburse funds for Taberna's general obligations. <br><br> Generally, disbursements occur on an ad hoc basis. |
| Taberna Escrow Account (9000) | Debtor Taberna maintains one escrow account. <br><br> This account receives principal and interest payments on securitization bonds owned by Debtor Taberna. <br><br> Generally, these receipts occur once per month (upon the processing the related securitization's waterfall). <br><br> This account disburses funds via transfer to account 0397. <br><br> Generally, these transfers occur via an automatic sweep each Friday and on the last day on every month. |
| RAIT Funding Operating Account (5657) | Debtor RAIT Funding maintains this account as its main operating account. <br><br> This account currently does not receive or disburse any funds. If it received any funds, those would occur via transfer from its ultimate Parent (Debtor RAIT Financial Trust), generally from account 2169.  If it made any disbursements, those would occur to satisfy any of its general obligations. <br><br> Debtor RAIT Funding has no material assets. |
| RAIT JV TRS Operating Account (9356) | Debtor RAIT JV TRS maintains this account as its main operating account. <br><br> This account currently does not receive any funds.   If it made any disbursements, those would occur to satisfy any of its general obligations including any required tax payments or those of its subsidiary, another debtor, RAIT JV TRS Sub. <br><br> Debtor RAIT JV TRS has no material assets. |