## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| RAIT FUNDING, LLC,<br>a Delaware limited liability company, *et al.*[1] | Case No. 19-11915 (BLS)<br>(Joint Administration Pending) |
| Debtors. | |

### DECLARATION OF JOHN J. REYLE IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST-DAY RELIEF

I, John J. Reyle, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.     I am the Chief Executive Officer (CEO), President, and General Counsel of RAIT Financial Trust, one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"), which is the ultimate parent of all the other Debtors and their various non-debtor subsidiaries.

2.     I have served as RAIT Financial Trust's CEO and President since June 2018 and served as Interim CEO and President since February 2018, and have served as RAIT Financial Trust's General Counsel since February 2017.  Prior to becoming RAIT Financial Trust's General Counsel, I held the following positions with RAIT Financial Trust: senior managing director—chief legal officer (January 2015 to February 2017); senior vice president—corporate

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable), are as follows: RAIT Funding, LLC, a Delaware limited liability company (9983); RAIT Financial Trust, a Maryland real estate investment trust (9819); RAIT General, Inc., a Maryland corporation (9987); RAIT Limited, Inc., a Maryland corporation (9773); Taberna Realty Finance Trust, a Maryland real estate investment trust (3577); RAIT JV TRS, LLC, a Delaware limited liability company (3190); and RAIT JV TRS Sub, LLC, a Delaware limited liability company (4870).  The mailing address for all Debtors is Two Logan Square, 100 N. 18th Street, 23rd Floor, Philadelphia, Pennsylvania 19103 (Attn: John J. Reyle).

counsel (January 2014 to December 2014), vice president—corporate counsel (May 2012 to December 2013), and corporate counsel (August 2009 to May 2012). As CEO and President, I am responsible for assisting in the management of RAIT Financial Trust's and its subsidiaries' operations, overseeing their liquidity management, and assisting with their restructuring process. In the course of serving in my various capacities with RAIT Financial Trust since August 2009, I have become familiar with the operations and financial affairs of the Debtors and their non-debtor subsidiaries.

3.     On August 30, 2019 (the "Petition Date"), the Debtors commenced the above-captioned chapter 11 cases (these "Chapter 11 Cases") by filing voluntary petitions for relief (the "Petitions") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), with this Court. The Debtors continue to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated. As set forth in Part IV, concurrently herewith, the Debtors have filed a motion seeking joint administration of the Chapter 11 Cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.     I submit this Declaration pursuant to Bankruptcy Rule 1007 to provide an overview of the Debtors' business and these Chapter 11 Cases and to support the Debtors' applications and motions for "first-day" relief (collectively, the "First-Day Motions"). Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management,

91436574.12

consultation with the Debtors' professional advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I believe all information herein to be true to the best of my knowledge.  I am authorized to submit this Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.      To familiarize the Court with the Debtors, the Chapter 11 Cases, and the relief sought in the First Day Motions, this Declaration provides a summary overview of the Debtors and the Chapter 11 Cases, and is organized as follows.  Part I describes the Debtors' business operations, corporate structure, key liabilities, and estate assets.  Part II describes the events leading up to the commencement of the Chapter 11 Cases.  Part III summarizes the Debtors' goals in commencing these Chapter 11 Cases.  Part IV sets forth my basis for testifying to the facts underlying and described in the First-Day Motions.

## I.      BACKGROUND REGARDING THE DEBTORS

### A.      Overview of the RAIT Enterprise

6.      RAIT Financial Trust (collectively with its Debtor and non-debtor affiliates, "RAIT") is an internally-managed real estate investment trust ("REIT") that, until February 2018, focused primarily on providing debt financing options to owners of commercial real estate ("CRE") throughout the United States.  RAIT also owns a portfolio of CRE properties located throughout the United States.  From its formation in 1997, RAIT had built a reputation for consistently executing efficiently with borrowers and their intermediaries by maximizing its experience in commercial real estate, deal structuring, and structured finance to deliver effective property-level financing solutions.  RAIT worked closely with its borrowers to meet their financing objectives, utilizing its in-house commercial real estate lending platform to originate,

underwrite, close and service quality lending opportunities. These directly originated

opportunities were vetted through RAIT's credit and risk management processes. The loans

RAIT made were secured by income-producing properties, including apartment, office and light-

industrial properties and neighborhood retail centers.

7.      Starting in early 2018, in response to certain recommendations of a special

committee of the Board of Trustees of RAIT Financial Trust (the "Board") (as further set forth in

Part II) and in an effort to increase liquidity and better position RAIT to meet its financial

obligations, RAIT made changes to its business operations, including the suspension of new

investment opportunities and its loan origination business and the sale of a portion of its owned

real estate and loan portfolio. Following these changes, RAIT remains an internally-managed

REIT and continues to conduct its business through its one reportable segment—i.e., its real

estate lending, owning, and managing segment, which is concentrated on lending, and owning

and managing RAIT's commercial real estate assets.

## B.      Corporate Structure

8.      RAIT Financial Trust is a Maryland REIT. It owns 100% of the equity of Debtors

RAIT General, Inc. and RAIT Limited, Inc., both Maryland corporations ("RAIT General" and

"RAIT Limited," respectively), which in turn are (i) the 1% general and 99% limited partner,

respectively, of non-debtor RAIT Partnership, L.P. ("RAIT Partnership") and (ii) the 1% and

99% members, respectively, of non-debtor RAIT Asset Holdings, LLC ("RAIT Asset

Holdings").[2] RAIT Financial Trust also owns 100% of the common stock and approximately

---

[2] RAIT Asset Holdings was an inactive indirect subsidiary of RAIT Financial Trust and was
contributed to RAIT General and RAIT Limited in connection with the internal restructuring
noted in footnote 4 to hold certain of the RAIT subsidiaries that the Stalking Horse Purchaser
does not intend to acquire, including RAIT Asset Holdings.

91436574.12

82.76% of the preferred stock[3] of Debtor Taberna Realty Finance Trust ("Taberna"), a Maryland REIT.

9.      RAIT Asset Holdings owns a 90% membership interest in, and Taberna owns a 10% membership interest in, Debtor RAIT JV TRS, LLC, a Delaware limited liability company ("RAIT JV TRS"), which in turn is the sole member of Debtor RAIT JV TRS Sub, LLC, a Delaware limited liability company ("RAIT JV TRS Sub").

10.     RAIT JV TRS Sub is the sole member of Debtor RAIT Funding, LLC, a Delaware limited liability company ("RAIT Funding").

11.     The Debtors' principal place of business is at Two Logan Square, 100 N. 18th Street, 23rd Floor, Philadelphia, PA 19103.

12.     For the Court's convenience, an organizational chart of the Debtors and their various non-debtor subsidiaries is attached as **Exhibit 1** hereto.  As shown on the chart, (i) Debtor Taberna has two active and seven inactive, wholly and directly owned non-debtor subsidiaries (*see* Ex. 1 at Exs. C, D); (ii) Debtor RAIT Funding has one active and four inactive, wholly and directly owned non-debtor subsidiaries (*id.* at Ex. E); (iii) Debtor RAIT JV TRS Sub has one active and two inactive, wholly and directly owned non-debtor subsidiaries (not including RAIT Funding's subsidiaries) (*id.*); and (iv) non-debtor RAIT Partnership has approximately 25 active wholly and directly owned non-debtor subsidiaries and 35 indirectly owned non-debtor subsidiaries (*see id.* Exs. A, B).[4]

---

[3] The remaining preferred stock is held by unaffiliated third parties.

[4] In August 2019, to facilitate a sale of the equity of RAIT Partnership, all of RAIT Partnership's 26 inactive subsidiaries and its 90% interest in RAIT JV TRS, LLC, were contributed by RAIT Partnership to RAIT Asset Holdings, the equity in which was, in turn, distributed pro rata to RAIT General (1%) and RAIT Limited (99%).

91436574.12

**C.**     **Debtors' Capital Structure and Principal Indebtedness**

13.     RAIT Financial Trust and certain of its Debtor and non-debtor affiliates maintain

various forms of short-term and long-term financing arrangements.  Certain of these financing

arrangements are collateralized by assets within securitizations, which are generally without

recourse to the Debtor entities or their property.  Certain of these financing arrangements are

with recourse to the applicable Debtor entity or entities.  The principal recourse indebtedness of

the applicable Debtor entities as of the Petition Date, as well as any equity securities held by

non-affiliated third parties, is described below.

*(i)*     ***RAIT Financial Trust***

14.     On April 14, 2014, RAIT Financial Trust issued 7.625% senior notes with a

maturity date of April 15, 2024 (the "7.625% Senior Notes").  The 7.625% Senior Notes were

issued pursuant to that certain Second Supplemental Indenture dated April 14, 2014 (the "Second

Indenture"), by and between RAIT Financial Trust, as issuer, and Wells Fargo Bank, National

Association ("Wells Fargo"), as trustee.  The Second Indenture supplemented the Indenture

dated December 10, 2013, by and between RAIT Financial Trust and Wells Fargo. Interest on

the 7.625% Senior Notes is payable quarterly on January 15, April 15, July 15, and October 15.

As of the Petition Date, approximately $56,324,125 of the 7.625% Senior Notes remain

outstanding.  The 7.625% Senior Notes are publicly held and currently trade on the Pink Open

Market of the OTC Markets Group ("OTCPK") under the symbol "RFTT."

15.     On August 14, 2014, RAIT Financial Trust issued 7.125% senior notes with a

maturity date of August 30, 2019 (the "7.125% Senior Notes" and, together with the 7.625%

Senior Notes, the "Senior Notes").  The 7.125% Senior Notes are publicly held and were issued

pursuant to that certain Third Supplemental Indenture dated August 14, 2014 ("Third

Supplemental Indenture"), by and between RAIT Financial Trust, as issuer, and Wells Fargo, as trustee.  The Third Supplemental Indenture supplemented the Indenture dated December 10, 2013, as amended, by and between RAIT Financial Trust and Wells Fargo.  Interest on the 7.125% Senior Notes is payable quarterly on February 28, May 30, August 30, and November 30.  As of the Petition Date, approximately $65,536,175 of the 7.125% Senior Notes remain outstanding.  The 7.125% Senior Notes are publicly held and currently trade on OTCPK under the symbol "RFTA."

16.     RAIT Financial Trust is the (i) subordinated guarantor of 100% of the Subordinated RF Junior Note (as defined below) pursuant to that certain Parent Guarantee Agreement between RAIT Financial Trust and The Bank of New York Trust Company, N.A. dated as of February 12, 2007, and (ii) the guarantor of 30% of the outstanding principal balance,[5] plus all collection costs, of a certain Mortgage Note issued to Liberty Bank by non-debtors Executive Mews Phase 2 and 4 Associates, LLC and Pine Tree Plaza LLC (the "Liberty Bank Borrowers"), for which RAIT Financial Trust has also issued a guaranty of non-recourse carve-outs (e.g., in the event of fraud on the part of the borrower).[6]

17.     RAIT Financial Trust has three classes of preferred stock issued and outstanding, which share *pari passu* in the event of a liquidation, namely: (i) 7.75% Series A cumulative redeemable preferred shares ($143,187,500 liquidation value); (ii) 8.375% Series B cumulative redeemable preferred shares ($62,719,925 liquidation value); and (iii) 8.875% Series C cumulative

---

[5] The principal balance is approximately $6,712,616 as of the Petition Date.

[6] The Liberty Bank Borrowers, who are managed by non-members that are affiliates of RAIT Partnership (RAIT Executive Mews Manager III, Inc. and RAIT Executive Mews Manager II, Inc.), own certain commercial real property in Cherry Hill, New Jersey that secures the Mortgage Note.  This property is master leased to an affiliate of RAIT Partnership (REM Cherry Hill, LLC), which also has an option to purchase the equity in the Liberty Bank Borrowers.

redeemable preferred shares ($43,950,750 liquidation value) (collectively, the "RAIT Preferred Stock"). The Series A, B, and C RAIT Preferred Stock is publicly held and currently trades on OTCPK under the symbols "RASFP," "RASFO," and "RASFN," respectively. RAIT Financial Trust also has common stock, which is publicly held and junior in right of distribution to the RAIT Preferred Stock. This common stock currently trades on OTCPK under the symbol "RASF."

### (ii)    *Taberna*

18.    On October 25, 2010, Taberna issued a junior subordinated note in the amount of $18,670,743, with a maturity date of March 30, 2035 (the "Subordinated Taberna Junior Note"). At issuance, the "fair value" option was elected for this note under FASB ASC Topic 825, which requires the note to be measured at fair value on a recurring basis with all changes in fair value recorded in earnings.[7] The Subordinated Taberna Junior Note was issued pursuant to that certain Junior Subordinated Indenture by and between Taberna and Wells Fargo, as trustee. The Subordinated Taberna Junior Note is secured by a pledge of Taberna's interest in the Class F, Class G, and Class H Notes issued by RAIT CRE CDO I, Ltd. The Subordinated Taberna Junior Note is held by Taberna Preferred Funding I, Ltd., an exempt company under the laws of the Cayman Islands ("TPF"). TP Management LLC ("TPF Collateral Manager") is the delegate collateral manager for TPF pursuant to that certain Delegation Agreement, dated as of December 14, 2014, as amended or supplemented from time to time (the "Delegation Agreement"). As of the Petition Date, the outstanding balance of the Subordinated Taberna Junior Note is approximately $18,670,743.

---

[7] Upon the adoption of Accounting Standards Update (ASU) 2016-01 issued by the Financial Accounting Standards Board, changes in fair value for the note due to changes in the obligor's credit risk were required to be recognized in other comprehensive income, and changes in fair value due to all other factors were required to be recognized in earnings.

91436574.12

19.     Taberna has one class of preferred stock issued and outstanding, namely: 12.5%

Series A cumulative non-voting preferred stock issued and outstanding (the "Taberna Preferred

Stock"), 82.76% of which is held by RAIT Financial Trust, with the balance held by unaffiliated

third-party investors.  Taberna also has common stock, which is held 100% by RAIT Financial

Trust.

### (iii)    *RAIT Funding*

20.     RAIT Funding and The Bank of New York Trust Company, National Association,

in its capacity as Trustee ("Indenture Trustee"), are party to that certain Junior Subordinated

Indenture dated as of February 12, 2007 (the "RF Note Indenture"), pursuant to which RAIT

Funding issued that certain Junior Subordinated Note due 2037 in the principal sum of twenty-five

million one hundred thousand dollars ($25,100,000) (the "Subordinated RF Junior Note" and,

together with the Subordinated Taberna Junior Note, the "Junior Subordinated Notes") to The

Bank of New York Trust Company, National Association, in its capacity as Property Trustee under

the Trust Agreement (as defined below) ("Property Trustee").  The Subordinated RF Junior Note

is guaranteed by RAIT Financial Trust on a subordinated basis pursuant to that certain Parent

Guarantee Agreement dated as of February 12, 2007 (the "RAIT Subordinated Guarantee

Agreement"), between RAIT and The Bank of New York Trust Company, National Association.

As of the Petition Date, the outstanding balance of the Subordinated RF Junior Note is

approximately $25,100,000.

21.     RAIT Funding and the Property Trustee, together with The Bank of New York

(Delaware), in its capacity as Delaware Trustee, and certain individuals, are parties to that certain

Amended and Restated Trust Agreement dated February 12, 2007 (the "RF Trust Agreement"),

which provided for the issuance and sale of certain undivided preferred beneficial interests (the

91436574.12

"TRuPs") by Taberna Funding Capital Trust I, a Delaware statutory trust (the "TFC Trust"), the proceeds of which sale were used by TFC Trust to acquire the Subordinated RF Junior Note. Kodiak CDO I, Ltd. ("Kodiak") is the owner of all of the TRuPs and EJF CDO Manager LLC, is the designated collateral manager for Kodiak (the "Kodiak Collateral Manager").

### D.    Debtors' Principal Assets

22.    The Debtors' principal assets consist of their equity interests in their respective Debtor and non-debtor affiliates.  Other material assets of the Debtors are described below.[8]

#### (i)    *RAIT Financial Trust*

23.    RAIT Financial Trust's other assets include (a) cash on hand of approximately $31,000,000, (b) certain tax attributes (including federal and state net operating loss carryforward deductions), and (c) rights under certain contracts (including customary insurance policies).

#### (ii)    *Taberna*

24.    Taberna's other assets include (a) cash on hand of approximately $8,600,000, (b) a senior participation interest in a commercial mortgage loan, (c) Class F, G, and H Note holdings in the RAIT I securitization, and (d) certain tax attributes (including accrued capital losses).

#### (iii)    *RAIT JV TRS Sub*

25.    RAIT JV TRS Sub's other assets include (a) certain tax attributes (including federal, state, and local net operating loss carryforward deductions and accrued capital losses),

---

[8] RAIT General and RAIT Limited do not have any material assets apart from their equity interests in non-debtor affiliates RAIT Partnership and RAIT Asset Holdings.  RAIT Funding does not have any material assets apart from its equity interest in non-debtor affiliate Taberna Funding Capital Trust I.  RAIT JV TRS does not have any material assets apart from its equity interest in Debtor RAIT JV TRS Sub.

10

and (b) a $532,935 income-tax-related asset on account of a federal alternative-minimum-tax credit.

**E.    Principal Assets of Non-Debtor Affiliates**

26.    The assets of the Debtors' non-debtor affiliates consist primarily of (i) cash, (ii) securities issued by and residual equity interests in three securitization transactions ("RAIT I," "RAIT FL7," and "RAIT FL8," as discussed further below); (iii) interests in CRE mortgages, mezzanine loans, and preferred equity interests, and (iv) real estate owned ("REO").

*(i)    Interests in Securitizations[9]*

27.    RAIT I.  The RAIT I securitization closed in 2006 and is collateralized by $176.7 million principal amount of CRE loans and participations, of which $32.8 million is defaulted. Debtor Taberna currently owns $24 million of the securities, at par value, that were originally rated investment grade issued by this securitization, which, as noted above, are pledged as collateral for the Subordinated Taberna Junior Note.  Non-debtor RAIT Preferred Holdings I, LLC, currently owns $15.04 million of the securities, at par value, that were originally rated investment grade, and $201.2 million of the non-investment grade securities and equity, at par value, issued by this securitization.

28.    RAIT FL7.  The RAIT FL7 securitization closed in 2017, and it has $184.4 million of total collateral at par value, none of which is in default.  RAIT FL7 has classes of investment-grade senior notes with an aggregate principal balance outstanding of approximately $119.4 million to investors.  Non-debtors RAIT FL Asset Holdings, LLC and RAIT 2017-FL7, LLC currently own the less-than-investment-grade classes of notes with an aggregate principal balance of $65.5 million, and the equity, or the retained interests, of RAIT FL7.

---

[9] Stated balances are current as of the July 2019 reports from the securitization trustees.

91436574.12

29.    <u>RAIT FL8.</u>  The RAIT FL8 securitization also closed in 2017, and it has $116.3 million of total collateral at par value, none of which is in default.  RAIT FL8 has classes of investment-grade senior notes with an aggregate principal balance outstanding of approximately $72.1 million to investors.  Non-debtor RAIT 2017-FL8, LLC currently owns the less-than-investment-grade classes of notes with an aggregate principal balance of $44.2 million, and the equity, or the retained interests, of RAIT FL8.

30.    The below table summarizes the current outstanding balances in the foregoing securitizations as of the most recent payment date:[10]

| ($ in millions) | RAIT I | FL 7 | FL 8 |
|---|---|---|---|
| Total Collateral Outstanding (Par) | $ 157.2 | $ 184.4 | $ 116.3 |
| Total Bonds Outstanding (Par) | $ 175.0 | $ 184.9 | $ 116.3 |
| Bonds Held by 3rd Parties Outstanding (Par) | $ 99.8 | $ 119.4 | $ 72.1 |
| RAIT Investment Grade Bond Ownership (Par) (1) (2) | $ 39.0 | $ - | $ - |
| RAIT Below Investment Grade Bond Ownership (Par) (1) (3) | $ 36.2 | $ 65.5 | $ 44.2 |
| RAIT Equity Interest Ownership (Par) | $ 165.0 | $ - | $ - |

### (ii)    *CRE Lending*

31.    RAIT's CRE lending platform previously focused on the origination of first lien loans, with some offerings of mezzanine loans and preferred equity interests in limited circumstances to support first lien loans.  RAIT's mezzanine loans are subordinate in repayment priority to a senior mortgage loan or loans on a property and are typically secured by pledges of ownership interests, in whole or in part, in the entities that own the real property.  RAIT generates a return on its preferred equity investments primarily through distributions to it at a fixed rate and the periodic payment of distributions are subject to there being sufficient net cash flow from the underlying real estate to make such payments.  RAIT used this investment

---

[10] RAIT ownership of bonds and equity interests includes ownership of all RAIT entities, whether they are Debtor or non-Debtor entities.

91436574.12

structure as an alternative to a mezzanine loan where the financial needs and tax situation of the borrower, the terms of senior financing secured by the underlying real estate or other circumstances necessitate holding preferred equity.  RAIT's CRE loans are in most cases non-recourse or limited-recourse loans secured by CRE assets or real estate entities.  This means that RAIT looks primarily to the assets securing the loan for repayment, subject to certain standard exceptions.  Where possible, RAIT sought to maintain direct lending relationships with borrowers, as opposed to investing in loans controlled by third-party lenders.

32.    The table below describes certain characteristics of RAIT's held-for-investment commercial mortgage loans, mezzanine loans, and preferred equity interests as of June 30, 2019 (dollars in thousands):[11]

| | Carrying Value | Weighted-Average Coupon | Range of Maturities | Number of Loans |
|---|---|---|---|---|
| **Commercial Real Estate (CRE) Loans** | | | | |
| Commercial mortgage loans | $ 331,979 | 6.8% | Jul. 2019 to Jun. 2025 | 25 |
| Mezzanine loans | 21,278 | 13.3% | Jun. 2020 to Mar. 2023 | 3 |
| Preferred equity interests | 28,452 | 5.9% | Mar. 2023 to Jun. 2029 | 13 |
| **Total investments in loans** | $ 381,709 | 7.2% | | 41 |

---

[11] More specifically, these assets are owned by Debtor Taberna or non-debtors RAIT Partnership; Edgerton Preferred Member, LLC; Grange Preferred Member, LLC; Walnut Ridge Preferred Member, LLC; Bluemound Preferred Member, LLC; Walnut Ridge Preferred Member, LLC; RAIT Capital Corp.; RAIT 2017-FL7 Intermediate Trust; RAIT 2017-FL8 Intermediate Trust; and RAIT CRE CDO I, Ltd., as applicable.

The charts below describe the property types and the geographic breakdown of the CRE properties securing RAIT's held-for-investment commercial mortgage loans, mezzanine loans, and preferred equity interests as of June 30, 2019:



(1)    Based on carrying amount.

### (iii)    REO Properties

33.    In the course of owning and/or servicing mortgage loans and exercising default remedies, RAIT from time to time obtains ownership of collateral real estate properties, which become REO.  RAIT's REO is classified as either "held and used" or "held for sale" in accordance with FASB ASC Topic 360.  The table below describes certain characteristics of RAIT's held-and-used REO portfolio as of June 30, 2019 (dollars in thousands):[12]

---

[12] More specifically, these assets are owned by non-debtors RAIT Partnership; Beachcomber Beach Resort Florida, LLC; St. Pete Beach Holdings, LLC; Oakland Plaza Owner, LLC; Oakland Square Owner, LLC; Union Medical Campus Owner, LLC; Washington SC SPE Owner, LLC; or Raritan Center SPE Owner, LLC, as applicable.  In addition, two of these assets are controlled by non-debtors REM Cherry Hill, LLC and REM-Willow Grove, L.P., as applicable.  The underlying entities that own that REO are considered "variable-interest entities" under FASB ASC Topic 810 and are consolidated by non-debtors REM Cherry Hill, LLC and REM Willow Grove, L.P., as applicable, under that accounting standard.

| | Investments in Real Estate (1) | Average Physical Occupancy | Units/ Square Feet/ Acres | Number of Properties |
|---|---|---|---|---|
| Office real estate properties | $ 49,027 | 84.1% | 349,999 | 3 |
| Retail real estate properties | 56,556 | 58.0% | 588,974 | 4 |
| Parcels of land | 18,744 | N/A | 9.2 | 4 |
| Total | $ 124,327 | — | | 11 |

34.     The charts below describe the property types and the geographic breakdown of RAIT's investments in REO as of June 30, 2019:




(1)   Based on gross cost.

### (iv)     Loan Servicing Rights

35.     RAIT Partnership serves as collateral manager, servicer, and/or special servicer to the securitizations it consolidates.  The loan servicing platform generates revenue for RAIT, provides additional oversight and information regarding the assets RAIT finances, and helps to maximize the value of RAIT's REO.

## II.     EVENTS LEADING TO THE CHAPTER 11 CASES

### A.     The 2017 Strategic Plan and Initial Process

36.     As a result of the 2008-2009 financial crisis, ongoing market conditions, and other factors, RAIT incurred approximately $1.468 billion in losses between 2008 and 2018 through mortgage write-offs, asset write-downs, and losses on the sale of assets.

37.     To fund its business during that period, RAIT issued convertible notes, senior notes, preferred stock, and common stock as follows:

91436574.12

2010:  $18.7 million junior subordinated note at fair value;[13]

2011:  $115 million in 7.0% convertible senior notes;[14]
$100 million in senior secured notes;[15]

2012:  $100 million Series D preferred stock;[16]

2013:  $125 million in 4.0% convertible senior notes;[17]

2014:  $60 million in 7.625% Senior Notes; and
$72 million in 7.125% Senior Notes.

2012-2016:  $54 million in net proceeds from Series A, Series B, and Series C preferred stock issued through RAIT Financial Trust's preferred ATM programs.

2012-2017:  $321 million in net proceeds from common stock issued in public offerings, through RAIT Financial Trust's Capital on Demand program, and through RAIT Financial Trust's Dividend Reinvestment and Share Purchase Plan program.

38.    During 2016 and 2017, RAIT sold or divested $737.2 million of its property

portfolio and reduced related indebtedness by approximately $652.0 million, as part of a plan to

transition to a monoline commercial lending business model.

---

[13] This note was issued by Taberna.

[14] Prior to 2018, all but $0.9 million of the 7.0% convertible notes were repurchased by RAIT Financial Trust in the open market or put to RAIT Financial Trust.  In 2018, RAIT Financial Trust exercised its right to optionally redeem and cancel the remaining 7.0% convertible secured notes.

[15] All of these notes were fully repaid by September 2018.

[16] Prior to 2018, RAIT Asset Holdings IV, LLC redeemed some of its preferred units, which resulted in the cancellation of the linked Series D Preferred Shares issued by RAIT Financial Trust.  In 2018, RAIT Asset Holdings IV, LLC redeemed its remaining preferred units, which resulted in the cancellation of the remaining Series D Preferred Shares issued by RAIT Financial Trust.

[17] Prior to and during 2018, RAIT Financial Trust repurchased some of the 4.0% convertible secured notes in the open market.  In 2018, some of the 4.0% convertible notes were put to RAIT Financial Trust, and RAIT Financial Trust exercised its right to optionally redeem and cancel the remaining notes.

39.     On September 7, 2017, RAIT Financial Trust announced that its Board had formed a committee of independent trustees (the "Special Committee") to explore and evaluate strategic and financial alternatives to enhance shareholder value and capitalize on RAIT's established and respected CRE lending platform and noted that such alternatives may include, but were not limited to, (i) refinements of RAIT's operations or strategy, (ii) financial transactions, such as a recapitalization or other change to RAIT's capital structure and (iii) strategic transactions, such as a sale of all or part of RAIT (the "Strategic Plan").  RAIT engaged UBS Securities LLC ("UBS") and Barclays Capital Inc. ("Barclays," and together with UBS, the "Advisors") to assist it in conducting a comprehensive evaluation of potential alternative transactions (the "Initial Process").  The Initial Process was designed to solicit proposals for a broad range of potential transactions, including a sale of all or part of RAIT or a recapitalization.

40.     During the Initial Process, RAIT and its Advisors contacted 84 potential buyers and investors, 33 of whom signed non-disclosure agreements.  On October 27, 2017, first-round bids were due; eight (8) potential counterparties submitted first-round bids on or shortly after this date.  On November 29, 2017, two counterparties submitted second-round proposals.

41.     RAIT granted a 44-day exclusivity period to one of the second-round counterparties.  During the exclusivity period and for a period thereafter, the Advisors worked with the Special Committee and RAIT's management team to provide due diligence information and financial projections to, and exchange and negotiate transaction documents with, this second-round counterparty.

42.     On February 14, 2018, the counterparty notified RAIT that it would not consummate the transaction as contemplated.  Thereafter, RAIT and its Advisors solicited a

17

revised proposal from the other second-round counterparty; however, that counterparty was not prepared to complete a transaction that was structurally agreeable to RAIT.

43.     In and around this same time, RAIT Financial Trust faced a potential delisting by the New York Stock Exchange ("NYSE") because the share price for its common stock was trading at levels approaching what the NYSE had considered to be "abnormally low" and could have resulted in RAIT's market capitalization falling below the NYSE market capitalization standards.  A delisting would have triggered defaults and cross-defaults of across RAIT Financial Trust's capital structure.[18]

44.     On February 20, 2018, RAIT announced that the Special Committee had concluded its review pursuant to the Initial Process.  The Board determined that this review did not identify a suitable strategic or financial transaction with a counterparty, or otherwise.  As a result, the Board, after considering the recommendations and advice of the Special Committee, RAIT's management, and its legal and financial advisors, determined that RAIT should take steps to increase its liquidity and better position RAIT to meet its financial obligations as they come due and to continue operating as a going concern.  These steps included, but were not limited to:

- The suspension of RAIT's loan origination business along with the implementation of other steps to reduce costs within its other operating businesses;

- The continuation of the process of selling RAIT's property portfolio while servicing and managing RAIT's existing CRE loan portfolio;

---

[18]  On May 11, 2018 when the common share price fell below $0.16, the NYSE suspended trading in RAIT Financial Trust's common shares and commenced delisting proceedings with respect to all of RAIT's publicly traded securities.  The delisting became effective on December 17, 2018.  Due to the strategic decisions made by RAIT's Board and management beginning in late February 2018, the delisting did not ultimately result in triggering defaults across RAIT Financial Trust's capital structure.

- The reduction of RAIT's outstanding indebtedness, with overall indebtedness declining by 54.7% during the 2018 fiscal year;

- The monetization of a portion of RAIT's loans and real estate assets, which monetization included the sale of loans, sale of real estate assets and repayment of loans;

- The sale of Urban Retail Properties, LLC, the entity through which RAIT provided property management services to office and retail properties;

- The down-sizing of the Board and executive suite;

- The implementation of a reduction in force of certain RAIT employees determined to be non-essential to RAIT's implementation of these strategic steps, which contributed to a reduced run rate of base compensation expenses from approximately $2.5 million per quarter as of December 31, 2017, to approximately $1.4 million per quarter subsequent to the reduction in force;

- The continued position of the Board not to declare any dividends on RAIT Financial Trust's outstanding common shares; and

- The engagement of a financial advisor focused on and with expertise in restructuring, to assist and advise RAIT Financial Trust during this process.

**B.      The 2018 Marketing Process**

45.      During the second half of 2018, RAIT reinitiated the process of evaluating strategic and financial alternatives.  In the summer and fall of 2018, on its own, RAIT solicited meetings and proposals from nine potential counterparties that were either identified during the Initial Process or, subsequently expressed interest directly to RAIT or through RAIT's advisors.

46.      In late October and early November 2018, RAIT received five (5) preliminary proposals from four (4) of the counterparties.  In November 2018, RAIT re-engaged UBS as an advisor, to continue the marketing process pursuant to a new engagement letter dated as of November 26, 2018.

47.      UBS engaged with the counterparties that had formerly been identified and had submitted proposals.  UBS also expanded the outreach soliciting five additional counterparties.

48.    UBS and RAIT set a bid date of January 23, 2019, for all interested parties to submit best and final proposals, and worked with the interested parties on their respective diligence processes leading up to the bid date.  Four proposals were received and the Board, after considering the recommendations and advice of RAIT's management and its legal and financial advisors, determined that RAIT should select the bid submitted by Fortress Credit Advisors LLC ("FCA"), on behalf of certain funds and/or accounts managed by it or its affiliates, as the highest and best proposal. This proposal was deemed the most attractive in terms of value, form of consideration, and lack of execution risk.

**C.    The Purchase Agreement with Fortress**

49.    After the selection of FCA's as the highest and best proposal, RAIT and FCA, on behalf of certain funds and/or accounts managed by it or its affiliates, entered into negotiations regarding the proposed structure and terms for the acquisition of RAIT.  On March 6, 2019, RAIT and FCA entered into a non-binding term sheet (the "Term Sheet"), which set forth the general terms for the acquisition by which certain funds and/or accounts managed by affiliates of Fortress Investment Group LLC ("Fortress") would purchase all of the reorganized equity interests of RAIT Financial Trust.

50.    After the execution of the Term Sheet, Fortress conducted approximately six months of extensive due diligence regarding all of the RAIT entities and the proposed structure of the transaction.  During this six-month period, RAIT and Fortress also engaged in lengthy negotiations regarding the structure of the transaction and the proposed terms and conditions of, among other things, a definitive equity and asset purchase agreement and form bidding procedures to be used for the contemplated Bankruptcy Court-approved auction and sale process.

51.     As a result of this diligence and negotiations, the proposed structure of the transaction was changed from a purchase of reorganized equity in RAIT Financial Trust to a purchase of all of the equity interests of RAIT Financial Trust's non-debtor subsidiary RAIT Partnership, together with certain other assets, in a sale under section 363 of the Bankruptcy Code.  Under the revised structure, RAIT Financial Trust and certain of its other excluded subsidiaries would not be sold to Fortress, but would be wound down via a chapter 11 plan of liquidation.

52.     On August 30, 2019, Debtors RAIT Financial Trust, RAIT General, RAIT Limited, and Taberna (collectively, the "Debtor Sellers") and CF RFP Holdings LLC, an entity owned by funds managed by affiliates of Fortress (the "Stalking Horse Purchaser"), entered into a certain Equity and Asset Purchase Agreement (the "Stalking Horse Purchase Agreement"), pursuant to which the Stalking Horse Purchaser will acquire, directly or indirectly (including through one or more of Stalking Horse Purchaser's affiliates), (i) from RAIT General and RAIT Limited the general partner and limited partner interests (the "RAIT Interests") in RAIT Partnership, as a result of which the Stalking Horse Purchaser (or one or more of its affiliates) will indirectly acquire the equity interests of RAIT Partnership in certain of its subsidiaries (as set forth in the Stalking Horse Agreement) and (ii) certain assets owned by certain of the Debtors ((i) and (ii), collectively, the "Purchased Assets") for the cash purchase price of approximately $174.4 million, subject to certain adjustments set forth in the Stalking Horse Purchase Agreement and subject to higher and better offers pursuant to a Bankruptcy Court-approved auction and sale process, free and clear of all liens, claims, encumbrances and interests (the "Sale Transaction").

21

**D.**     **Negotiations Regarding the Junior Subordinated Notes**

53.     Prior to the Petition Date, while RAIT was negotiating the definitive Stalking Horse Purchase Agreement, RAIT was also engaging in discussions with holders of the beneficial interests in the Junior Subordinated Notes.

54.     On August 29, 2019, RAIT Financial Trust, Taberna, and TPF Collateral Manager, as collateral manager for TPF, entered into that certain Restructuring and Plan Support Agreement (the "TPF RSA").  TPF is the sole holder of the Subordinated Taberna Junior Note. The TPF RSA establishes the terms pursuant to which TPF Collateral Manager, as Collateral Manager for TPF, will support a chapter 11 plan for the Debtors (the "Plan").

55.     On August 31, 2019, RAIT Financial Trust, RAIT Funding, and Kodiak entered into that certain Restructuring and Plan Support Agreement (the "Kodiak RSA", and together with the TPF RSA, the "RAIT RSAs").  Kodiak is the sole owner of the TRuPs.  Kodiak is the beneficial owner of and controls claims arising under the Subordinated RF Junior Note and RAIT Subordinated Guarantee Agreement.  The Kodiak RSA establishes the terms pursuant to which Kodiak will support the Debtors' Plan.

56.     The counterparties to the RAIT RSAs, who are impaired, have agreed to support the restructuring of the Debtors' indebtedness and other obligations and interests which, subject to the consummation of the Sale Transaction and confirmation of the Debtors' Plan, would result in all other creditors of the Debtors, including the holders of the 7.125% Senior Notes, the holders of the 7.625% Senior Notes, and all administrative, priority and general unsecured claims, receiving payment in full, in cash of their allowed claims.

91436574.12

E.    **Failure to File 10-Qs and Senior Note Defaults**

57.    As of the Petition Date, RAIT has not filed its Quarterly Report on Form 10-Q for the quarterly periods ending March 31, 2019 and June 30, 2019 (collectively, the "10-Qs") with the SEC.  RAIT has been unable to timely file its 10-Qs because it required additional time to complete an evaluation of whether its owned preferred equity interests should be accounted for as loans, equity method investments, or debt securities, which RAIT reported in a public filing with the SEC on May 16, 2019.  Historically, RAIT has accounted for its preferred equity interests as loans, which were reflected on its balance sheets included in its 2018 Annual Report on Form 10-K.  However, shortly before the required filing date of RAIT's 2019 First Quarter Report on Form 10-Q, questions arose in discussions with RAIT's long-time auditor, KPMG LLP, related to RAIT's historical accounting for these preferred equity interests.  On June 6, 2019, RAIT was authorized by the Audit Committee of its Board to request accounting guidance from the SEC's Office of the Chief Accountant (the "OCA") regarding the accounting treatment for its preferred equity interests. With the cooperation of KPMG, RAIT transmitted a written submission to the OCA to request such guidance on August 14, 2019, and is awaiting a response. Upon receipt of the requested guidance, RAIT will determine the appropriate response consistent with such guidance.

58.    As a result of RAIT's failure to timely file the Q1 10-Q, RAIT Financial Trust is in default under both series of Senior Notes.  On July 1, 2019, as required under the applicable documents governing the Senior Notes, RAIT notified Wells Fargo, as trustee of the Senior Notes, of such defaults.  On August 20, 2019, RAIT received a notice of default from Wells Fargo, the Trustee under the Senior Notes, as a result of RAIT's failure to file the Q1 10-Q.  As

of the Petition Date, this default had not become an Event of Default (as defined in the Second

Indenture and Third Supplemental Indenture).

### III.    GOALS OF THE CHAPTER 11 CASES

59.     The Debtors commenced these Chapter 11 Cases to preserve and maximize the

value of their assets for the benefit of their stakeholders by pursuing the Sale Transaction with

the Stalking Horse Purchaser through a public, Court-supervised process that will be subject to

higher or otherwise better offers.  The Debtors' goal is to consummate the Sale Transaction as

expeditiously as possible in order to minimize the time and expense necessarily attendant to the

chapter 11 process, and thereafter, to promptly distribute the proceeds of such Sale Transaction

pursuant to a consensual Plan so as to maximize and expedite recoveries to the Debtors' creditors

and other stakeholders  To these ends, the Debtors have filed the First-Day Motions, which are

designed to smooth their transition into the chapter 11 process and minimize any disruption to

their business that might otherwise occur as a result of their bankruptcy filing, and they will seek

to have them heard by the Court as promptly as schedules permit.

60.     In the following weeks, and in accordance with any applicable "Bankruptcy

Milestones" in the Stalking Horse Purchase Agreement, the Debtors anticipate filing requests for

customary "second-day" relief such as the retention of professionals and establishment of interim

compensation procedures, as well as (i) a motion to approve the sale of substantially all of their

assets, and to approve bidding procedures in connection therewith (including certain stalking-

horse protections for the Stalking Horse Purchaser), (ii) Schedules of Assets and Liabilities and

Statements of Financial Affairs for all Debtors, (iii) a motion to establish bar dates for the filing

of proofs of claim against the Debtors, (iv) the Plan and related disclosure statement, and (v) a

motion to approve the disclosure statement and approve solicitation procedures.

91436574.12

61.     The Debtors also intend to dual-track their sale process with a chapter 11 plan process that will build upon the solid foundation laid by the Debtors' negotiations to date with the holders of the beneficial interests in the Junior Subordinated Notes.

## IV.    FIRST-DAY MOTIONS

62.     To enable the Debtors to operate effectively and minimize potential adverse effects from the commencement of the Chapter 11 Cases, the Debtors have requested certain relief through the First-Day Motions filed with the Bankruptcy Court concurrently herewith.  The Debtors respectfully request that this Court enter the proposed orders granting the relief requested in such First-Day Motions.  I believe that the relief sought in each of the First-Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) is necessary to avoid immediate and irreparable harm to the Debtors' businesses.

63.     The First-Day Motions that are sought to be heard at the "first-day" hearing in these Chapter 11 Cases are as follows:

- *Debtors' Motion for Order Authorizing (I) Joint Administration of Chapter 11 Cases and (II) Filing of a Consolidated Creditor Matrix*

- *Debtors' Application for Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent, Effective as of the Petition Date*

- *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue to Operate  the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Suspending the Requirements Contained in Section 345(b) of the Bankruptcy Code, and (III) Granting Related Relief*

- *Debtors' Motion for Interim and Final Orders Authorizing them to Pay Prepetition Employee Wages and Other Compensation, Benefits, Business Expenses, and Related Items*

91436574.12

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, and (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment*

64.    I have reviewed each of the First-Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First-Day Motions are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First-Day Motions.

65.    Furthermore, as a result of my personal knowledge, information supplied to me by other members of Debtors' management, from my review of relevant documents, or upon my opinion based upon my experience, discussions with the Debtors' professional advisors, and knowledge of the Debtors' operations and financial condition, I believe the relief sought in the First-Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy and to avoid immediate and irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

91436574.12

For the reasons stated herein and in each First-Day Motion, I respectfully request that each First-Day Motion be granted in its entirety, together with such other and further relief as the Court deems just and proper.  I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: Philadelphia, Pennsylvania
       September 2, 2019

John J. Reyle
Chief Executive Officer, President,
and General Counsel

**EXHIBIT 1**

**Corporate Organizational Chart**

91436574.12

# RAIT Financial Trust (OTC Pink: RASF) Schedule 3.2(f) Organizational Chart

## At August 29, 2019

**Notes:**
-All equity holdings are 100% unless otherwise noted.
-Only consolidated subsidiaries are shown.  Interests in unconsolidated entities are not shown.
-MEM means Member
-MAN means Manager
-LP means Limited Partner
-GP means General Partner



# RAIT Financial Trust
# Schedule 3.2(f) Organizational Chart at 8/29/2019

RAIT Financial Trust

## Exhibit A, Page 1
## RAIT Partnership, L.P. Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.



3

# Exhibit A, Page 2
# RAIT Partnership, L.P. Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.



4

# Exhibit A, Page 3
# RAIT Partnership, L.P. Subsidiaries at 8/29/2019

* Entity is not owned by RAIT, listed solely to indicate ownership chain
(1) Ownership shown on page 2.
(2) No ownership interest in REM Cherry Hill, LLC ("RCH"). Fee Owner and Master Lessor of Executive Mews – Cherry Hill property.

RAIT Financial Trust

# Exhibit B, Page 1
# RAIT Asset Holdings, LLC Subsidiaries at 8/29/2019



**RAIT Asset Holdings, LLC** (1)

- RAIT Sabel Key Manager, Inc.
- RAIT CRE Conduit II, LLC
- RAIT CRE Conduit III , LLC
- RAIT CRE Conduit IV , LLC
- RAIT Lending, LLC
- Tuscany Bay Apartments Florida, LLC
- McDowell Mountain Member, LLC
  - McDowell Mountain Arizona, LLC
- Remington Florida Member, LLC
  - Remington Florida, LLC
- Yamato Investor I, LLC
- Yamato Investor II, LLC

- Trails at Northpoint Mississippi Member, LLC
  - Trails at Northpoint Mississippi Owner, LLC
- Yamato Member, LLC
  - Boca Yamato, LLC
- Erieview Galleria Owner, LLC
- Lexington Mill Mississippi Member, LLC
  - Lexington Mill Mississippi Owner, LLC
- Route 18 Member, LLC
  - Route 18 SPE Owner, LLC
- Murrells Retail Holdings, LLC
  - Murrells Retail Associates, LLC
- Erieview Tower Member, LLC
  - Erieview Tower & Parking Manager, Inc.    99.5% member
    - .5% member
    - Erieview Tower & Parking, LLC

(1) Ownership shown on page 2.



RAIT
Financial Trust

6

# Exhibit B, Page 1
# RAIT Asset Holdings, LLC Subsidiaries at 8/29/2019





* Entity is not owned by RAIT, listed solely to indicate ownership chain
(1)      Ownership shown on page 2.
(2)      Ownership shown on page 11.

7

# Exhibit C, Page 1
# Taberna Realty Finance Trust Active Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.



8

# Exhibit D, Page 1
# Taberna Realty Finance Trust Inactive Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.



9

## Exhibit E, Page 1
## RAIT JV TRS Sub Active Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.

10

# Exhibit E, Page 2
## RAIT JV TRS Sub Inactive Subsidiaries at 8/29/2019



(1) Ownership shown on page 2.