IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RAIT FUNDING, LLC,<br>  a Delaware limited liability company, *et al.*[1]<br><br>Debtors. | Chapter 11<br>Case No. 19-11915 (BLS)<br><br>(Jointly Administered)<br><br>Hearing Date: December 5, 2019 at 10:00 a.m.<br>Objection Deadline: December 2, 2019 at noon. |

**MOTION OF THE AD HOC COMMITTEE OF PREFERRED EQUITY SECURITY HOLDERS OF RAIT FINANCIAL TRUST TO TERMINATE THE DEBTORS' EXCLUSIVE PERIOD TO PROPOSE AND SOLICIT ACCEPTANCES OF A PLAN OF REORGANIZATION**

The Ad Hoc Committee of Holders of Preferred Equity (the "**Ad Hoc Committee**") Issued by RAIT Financial Trust ("**RAIT Parent**"), by its attorneys, moves the Court (the "**Motion**") pursuant to section 1121(d)(1) of title 11 of the United States Code (the "**Bankruptcy Code**"), for an entry of an order, substantially in the form annexed hereto as **Exhibit A**, terminating the Debtors' exclusive period to propose and solicit acceptances of a plan of reorganization.  In support of this Motion, the Ad Hoc Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.   The Debtors' exclusivity period during which they, and only they, may file a plan must be terminated to preserve the rights of disenfranchised equity holders.  There is no reason

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number (if applicable), are as follows: RAIT Funding, LLC, a Delaware limited liability company (9983); RAIT Financial Trust, a Maryland real estate investment trust (9819); RAIT General, Inc., a Maryland corporation (9987); RAIT Limited, Inc., a Maryland corporation (9773); Taberna Realty Finance Trust, a Maryland real estate investment trust (3577); RAIT JV TRS, LLC, a Delaware limited liability company (3190); and RAIT JV TRS Sub, LLC, a Delaware limited liability company (4870).

for this Court to allow the Debtors to proceed on their plan of reorganization (the "**Plan**") [Docket No. 139], without there being an alternative competing plan providing different and better treatment for creditors and equity stakeholders to consider. Doing so would in essence compel estate stakeholders to either accept an unsatisfactory plan or have no recovery at all, clearly an unfair result. Instead, the Ad Hoc Committee has proposed a fully funded and confirmable alternative structure for paying claims in full and providing equity holders with far better treatment than that proposed by the Debtors and CF RFP Holdings LLC, an entity owned by funds managed by affiliates of Fortress Investment Group LLC ("**Fortress**") to be consummated under a plan of reorganization (the "**AHC Plan**").

2. The Ad Hoc Committee and its representatives have had dozens of meetings and calls over the past month, primarily with private investment funds and multiple, multi-billion dollar institutions, about financing the AHC Plan. As set forth in the *Objection Of Ad Hoc Committee Of Holders Of Preferred Equity Issued By Rait Financial Trust To Debtors' Motion For Approval Of The Sale Of Substantially All Of Its Assets* (the "**Sale Objection**") [Docket No. 203], the Ad Hoc Committee, in coordination with Never Summer Holdings LLC, negotiated a Commitment Letter with Magnetar Capital LLC and its affiliate Magnetar Financial LLC ("**MFL**") on behalf of one or more funds or accounts managed by MFL (collectively, "**Magnetar**") and Moab Partners, L.P. ("**Moab**," collectively, with Magnetar, the "**New Investors**") to provide $50 million in AHC Plan funding (Magnetar and MOAB manage $13 billion and $750 million, respectively). The AHC Plan will provide payment to all creditors in accordance with their contractual rights and facilitate the Debtors' emergence from Chapter 11 with at least $65 million in shareholders' equity. A Term Sheet reflecting the treatment of

classes of claims and interests under the AHC Plan and other significant AHC Plan terms was filed with the Sale Objection.[2]

3.      The Ad Hoc Committee submits, and will demonstrate at the hearing on this matter, that the Debtors' enterprise value is between $190 million and $240 million.  The headline number under the Equity and Asset Purchase Agreement with Fortress, which will provide the source of funding for the Debtors' Plan, purports to be $174.4 million, but that includes a significant amount of the Debtors' own cash.  The actual cash consideration being provided by Fortress is only about $129 million (the "**Sale**").

4.      As of the Petition Date, the Debtors' principal assets consisted of $300 million of commercial real estate loans (none of which was in default) held by two non-Debtor affiliates, RAIT FL7 ("**FL7**") and RAIT FL8 ("**FL8**").  This valuable portfolio of approximately 20 commercial real estate loans is held by the Debtors in the form of commercial mortgage backed securities ("**CMBS**"), *i.e.,* pools of commercial mortgages which pay interest and principal to investors in accordance with an agreed waterfall.  Each of the loans is currently deemed "performing" by the collateral manager, which is RAIT Parent itself.  Since the bankruptcy filing on August 30, 2019, $67 million of these loans has been repaid, leaving a balance of $233 million.  These loans are short-term and first lien, with approximately 99% of maturities before March 2021.  While some loans provide for borrower extensions, they also have often been repaid prior to their stated maturity dates.  The Ad Hoc Committee notes, and asks that the Court take judicial notice, that the commercial mortgage market is healthy, interest rates are low, and borrowers are experiencing strong competition among lenders for their business.

---

[2] The Commitment Letter and Term Sheet are annexed hereto as **Exhibit B**.

5.	The organic, scheduled liquidation of this collateral will enable the CMBS entities to pay off all of their debt, including approximately $65 million of FL7 debt and $45 million FL8 debt held by RAIT itself, or $110 million, by February 2021.  From the perspective of potential funders of additional capital for RAIT Parent, the pay-down of collateral in FL7 and FL8 - and thereby the senior notes issued by those entities - improves the value of RAIT Parent's interests in those CMBS entities, as it accelerates the period within which RAIT Parent would expect to receive a pay-down of its holdings.

6.	Other significant assets at RAIT Parent include its 10 real estate properties, carried at $113.6 million as of June 30, 2019, but which carry significant indebtedness, some of which is owned by RAIT Parent via its CDO I securitization.  RAIT Parent owned $38.9 million of CDO I's securities as of June 30, 2019, of which $24.0 million were pledged to the Taberna Note.  RAIT Parent also directly owns mortgages previously held by RAIT CDO II, which paid off its non-RAIT securities holders in the fourth quarter of 2018, allowing RAIT Parent to bring the CDO's assets directly onto its own balance sheet.

7.	If the Sale to Fortress were to be approved on its current terms, Fortress would receive an immediate windfall in the form of the Debtors' balance sheet cash, exceeding $40 million, and the short-term pay-down of approximately $110 million from the 20 or so commercial mortgages held in FL7 and FL8.  Thus, Fortress will receive the full benefit of the Debtors' remaining assets after FL7 and FL8 are liquidated.  Stated another way, Fortress is investing $129 million and if the Sale and Plan go forward, the Debtor will return almost $150 million to Fortress within 16 months from the Debtors' own cash and self-liquidating FL7 and FL8 securities.  This windfall, of course, comes at the expense of the preferred shareholders who, without termination of exclusivity, will be forced either to accept such an unsatisfactory plan or

to reject it and have no ready alternative to which to turn, and perhaps face the prospect of a conversion to a liquidation. With such a valuable and liquid asset pool, it cannot be gainsaid that a plan of reorganization such as that being assembled by the Ad Hoc Committee that allows such value to be fully realized over the next 16 months is a mechanism to maximize value far superior to the sale to Fortress.

8.      There is no reason for this Court to approve the Debtors' plan that wipes out preferred shareholders when preferred shareholders are in fact "in the money," and the AHC Plan will permit the preferred shareholders to realize the value to which they are entitled.

9.      In its 10-Q for the period ended June 30, 2019, filed on November 7, 2019,[3] RAIT Parent represents that shareholders' equity was $64,454,000. Importantly, shareholders' equity at fair value even exceeds that figure. After adjusting the Debtors' investment in mortgage loans to reflect fair value ($333,668,000 in mortgage loans at fair value versus $361,134,000 carrying value [**Exhibit** C, page 26]), shareholders' equity would be reduced by $27,466,000 to $36,988,000. However, the consolidated balance sheet in the 10-Q includes shareholders' deficits for RAIT Securitizations and RAIT VIE Properties in the amounts of $21,918,000 and $6,836,000, respectively [**Exhibit C**, page 31], which are non-recourse and for which RAIT Parent therefore has no liability. Once those non-Debtor shareholders' deficits in the aggregate amount of $28,754,000 are eliminated, the fair value of shareholders' equity is $65,742,000.

10.     Thus, one can only conclude, and RAIT Parent now must concede, that there is a substantial likelihood that equity holders will receive a meaningful distribution if allowed to file the AHC Plan. At least there would be a meaningful distribution to equity if the Debtors were not pursuing a misguided sale process designed to wipe out that substantial quantum of

---

[3] See **Exhibit C**.

shareholders' equity for no legitimate reason.  Nor does there appear to be any evidence of a substantial decrease in value since June 30, 2019.  In fact, the Debtors' assets appear to be performing well and providing significant liquidity to the estates.

11.     Based on the foregoing, the Court should terminate the Debtors' exclusivity and permit the Ad Hoc Committee to advance the AHC Plan that actually will maximize value for the benefit of all constituencies.

## BACKGROUND

12.     On August 30, 2019 (the "**Petition Date**"), the Debtors each commenced a voluntary case under chapter 11 of the Bankruptcy Code.  On September 4, 2019, the Court entered an Order Directing Joint Administration of the Debtors under case number 19-11915(BLS) [Docket No. 25].

13.     The Debtors are continuing operations and management as debtors in possessions pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.     On September 9, 2019 the Debtors filed their Motion for Entry of an Order (I) Establishing the Bidding Procedures, Including Approval of A Break-Up Fee and Expense Reimbursement, (II) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Interests and Encumbrances, and (III) Granting Related Relief (the "**Sale Motion**") [Docket No. 53].

15.     On September 17, 2019, the U.S. Trustee filed a Notice of Appointment of the Unsecured Creditors' Committee [Docket No. 65].

16.     On October 14, 2019, the Debtors filed the Plan and the Disclosure Statement for the Plan. [Docket No. 139 and 140, respectively]

17.     On November 18, 2019, counsel for the Ad Hoc Committee filed their Notice of Appearance, Rule 2019 Statement and Objection to the Sale Motion [Docket No. 200, 201 and 203, respectively].

## JURISDICTION, VENUE AND STATUTORY PREDICATE

18.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Ad Hoc Committee consents to entry of a final order by the Bankruptcy Court determining this Motion.

19.     The statutory predicate for the relief sought herein is section 1121(d)(1) of the Bankruptcy Code.

## BASIS FOR THE RELIEF REQUESTED

20.     "Only the debtor may file a plan until after 120 days after the date of the order for relief under" chapter 11. 11 U.S.C. § 1121(b). The underlying purpose of exclusivity "at the outset of a Chapter 11 case" gives a debtor "the unqualified opportunity to negotiate a settlement and propose a plan of reorganization without interference from creditors and other interests." *In re Texaco Inc.*, 81 B.R. 806, 809 (Bankr. S.D.N.Y. 1988) (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 221–222 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787).

21.     Section 1121, however, also embodies "a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd* 484 U.S. 365 (1988). The statute "was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *Id*.

22. This Court may reduce or terminate the exclusivity periods upon motion and for "cause" shown, 11 U.S.C. § 1121(d)(1), and "[t]he party who seeks the extension or the reduction of the exclusivity periods has the burden of establishing cause." *In re Texaco Inc.*, 76 B.R. 326 (Bankr. S.D.N.Y. 1987) (collecting cases). The ultimate decision on exclusivity rests within the discretion of the bankruptcy court. *See First Am. Bank of N.Y. v. S.W. Gloves & Safety Equip., Inc.*, 64 B.R. 963, 965-66 (D. Del. 1986).

23. Although the Bankruptcy Code does not define "cause", courts have looked to the legislative history of section 1121(d) for guidance. *See In re Gibson & Cushman Dredging Corp.*, 101 B.R. 405, 409 (E.D.N.Y. 1989); *In re Amko Plastics, Inc.*, 197 B.R. 74, 77 (Bankr. S.D. Ohio 1996). Courts may also consider the following factors:

    a. the size and complexity of the case;

    b. the necessity of sufficient time to negotiate and prepare adequate information;

    c. the existence of good faith progress toward reorganization;

    d. whether the debtor is paying its debts as they come due;

    e. whether the debtor has demonstrated reasonable prospects for filing a viable plan;

    f. whether the debtor has made progress in negotiating with creditors;

    g. the length of time the case has been pending;

    h. whether the debtor is seeking the extension to pressure creditors; and

    i. whether unresolved contingencies exist.

*See In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002) (citing *In re Service Merchandise Co.*, 256 B.R. 744, 751 (Bankr. M.D. Tenn. 2000); *In re Crescent Mfg.*, 122 B.R. 979, 982 (Bankr. N.D. Ohio 1990); *In re McLean Indus. Inc.*, 87 B.R. 830, 834

(Bankr. S.D.N.Y. 1987); *See also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 587 (Bankr. S.D.N.Y. 2006), *clarified on denial of reconsideration*, No. 02-41729, 2006 WL 2927222 (Bankr. S.D.N.Y. Oct. 10, 2006); *In re Borders Grp., Inc.*, 460 B.R. 818 (Bankr. S.D.N.Y. 2011).

24. Weighing these factors, the Debtors have not set forth a plan that adequately provides for all of the parties, especially considering the Ad Hoc Committee's ability to identify in very short order significant sources of recovery for the preferred equity holders and obtain a $50 million commitment to fund the AHC Plan:[4]

    a. <u>The size and complexity of the case.</u> The Ad Hoc Committee has demonstrated the ease with which the AHC Plan can be formulated and provide for a substantial return to the preferred equity security holders who would otherwise be receiving nothing under the Debtors' proposed plan.

    b. <u>The necessity of sufficient time to negotiate and prepare adequate information.</u> Any argument by the Debtors regarding a lack of sufficient time to negotiate and propose a plan falls flat as the Debtors have already filed their Plan but it is seriously deficient.

    c. <u>The existence of good faith progress toward reorganization</u>. The Debtors cannot demonstrate good faith effort towards reorganization where the rights of the preferred shareholders have been ignored, the Plan offers the assets of the Debtor to Fortress for less than fair value and the Debtors have, among other things, engaged in bid chilling. *See* Sale Objection [Docket No. 203]. "In evaluating whether a plan has been filed in good faith, a court should look to the totality of the circumstances, including: (1) whether a plan comports with the provisions and purpose of the Code and the chapter under which it is proposed, (2) whether a plan is feasible, (3) whether a plan is proposed with honesty and sincerity, and (4) whether a plan's terms or the process used to seek its confirmation was fundamentally fair." *In re Riviera Drilling & Expl. Co.*, No. BR 10-11902, 2012 WL 6719591, at *6 (Bankr. D. Colo. Dec. 19, 2012), aff'd, 502 B.R. 863 (10th Cir. BAP (Colo.) 2013) (citing *In re Global Water Technologies, Inc.,* 311 B.R. 896, 903 (Bankr. D. Colo. 2004)). Here, the Debtors cannot overcome the burden of demonstrating a good faith plan of reorganization because the Debtors have not provided any recovery for preferred shareholders even though they are "in the money." Yet, the AHC Plan would provide preferred equity security holders a substantial recovery.

---

[4] The Committee submits that some of the factors identified in *Cent. Jersey Airport Servs., LLC* are not relevant in this atypical situation where the facts are unique.

d.  <u>Whether the Debtors have demonstrated reasonable prospects for filing a viable plan.</u> The Plan set forth by the Debtors will ultimately fail. Confirmation of any plan of reorganization under Chapter 11 will require this Court to evaluate the best interests of the shareholders. "Congress created a provision in the Bankruptcy Code that is commonly referred to as the 'best interest … test.' 11 U.S.C. § 1129(a)(7)(A)(i–ii). Under the test, every creditor [and shareholder] to a Chapter 11 reorganization plan must receive at least the liquidation value of its claim [or interest] under the plan as it would in a Chapter 7 proceeding against the debtor in order for the court to find the plan is in the creditors' [and shareholders'] best interest. The bankruptcy courts determine this liquidation value by 'conjur[ing] up a hypothetical [C]hapter 7 liquidation that would be conducted on the effective date of the plan.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 141 (D. Del. 2012), *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013), and *aff'd*, 532 F. App'x 264 (3d Cir. 2013), and *aff'd*, 729 F.3d 311 (3d Cir. 2013), and *aff'd sub nom. In re WR Grace & Co.*, 729 F.3d 332 (3d Cir. 2013). Applying this test to the facts set forth in this Motion, the Plan filed by the Debtors does not satisfy the "best interest" test with respect to shareholders as the value of the assets exceeds all liabilities.

   Moreover, because a superior transaction is at hand under which equity would realize value rather than being wiped out, the Plan discriminates unfairly and thus violates section 1129(b)(1).

e.  <u>Whether the Debtors have made progress in negotiating with creditors.</u> The Debtors have not made any progress in negotiating with the Ad Hoc Committee. As set forth in the Sale Objection, favorable treatment was given to Fortress in negotiating the Sale, ultimately at a total loss to the preferred equity security holders. Despite the efforts of the Ad Hoc Committee, the Debtors have not engaged in any meaningful negotiations. Termination of the exclusivity period is needed to bring the Debtors to negotiate, settle and compromise through a competing plan whereby the all parties in interest can realize greater value. See, *In re Timbers of Inwood Forest Associates, Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd* 484 U.S. 365 (1988) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors.").

f.  <u>The length of time the case has been pending.</u> The cases were filed less than three months ago. Despite the relative infancy of the cases, the Debtors are looking to sell substantially all of their assets to Fortress at fire sale prices, and propose a plan that woefully undervalues the potential recovery to all constituents. To head off the potential that significant enterprise value will be lost, the AHC Plan not only pays all creditors in full, it also maximizes a return to the preferred equity.

25.     As set forth in *Situation Management Systems, Inc.*, the Court should look to the Debtors' use of the exclusivity period to force parties in interest to accept an unsatisfactory or unconfirmable plan. *In re Situation Mgmt. Sys., Inc.,* 252 B.R. 859, 863 (Bankr. D. Mass. 2000). Clearly the Ad Hoc Committee finds the proposed Plan unsatisfactory as it does not provide for any recovery for equity, despite the Debtors' own proof to the contrary in the RAIT Parent 10-Q. The continuation of the exclusivity period will be futile and to the unfair detriment of the Ad Hoc Committee.

26.     The Ad Hoc Committee seeks to file the AHC Plan to provide recovery to all parties in interest, including the preferred equity security holders.  Given the Debtors' failure to file a plan that is in the best interests of all parties in interest, the Court should exercise its discretionary authority to terminate the exclusivity period and allow the Ad Hoc Committee to file its competing AHC Plan.

## **NOTICE**

27.     Notice of this Motion will be given to counsel for (i) the Debtors, (ii) the U.S. Trustee, (iii) the Official Committee of Unsecured Creditors, and (iv) through the Court's CM/ECF system, all other parties having filed a request for notice.  It is respectfully submitted that, in light of the nature of the relief requested, no other or further notice need be given.

28.     No prior motion for the relief requested herein has been filed in this or any other court.

WHEREFORE, the Ad Hoc Committee requests that this Court grant this Motion, terminate the Debtors' exclusivity and afford the Ad Hoc Committee such other relief as the Court deems proper.

DATED:  November 21, 2019				Respectfully submitted,

                                              */s/Joseph H. Huston, Jr.*
Joseph H. Huston, Jr. (No. 4035)
Stevens & Lee, P.C.
919 North Market Street, Suite 1300
Wilmington, DE   19801
Phone: (302) 425-3310
Fax:    (610) 371-7972
Email:  *jhh@stevenslee.com*

                      -and-

Nicholas F. Kajon*
Constantine Pourakis*
Andreas D. Milliaressis*
Stevens & Lee, P.C.
485 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 319-8500
Fax: (212) 319-8505
Email: nfk/cp/adm@stevenslee.com
*Admission *pro hac vice* pending

*Counsel to Ad Hoc Committee of Preferred Equity Security Holders of RAIT Financial Trust*