IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

*FILED 2020 FEB 28 PM 1:27 CLERK US BANKRUPTCY COURT DISTRICT OF DELAWARE*

In re:                                                                                      Chapter 11

RAIT FUNDING, LLC,                                              Case No/ 19-11915 (BLS)

a Delaware limited liability company, et al,         (Jointly Administered)

Debtors.

## MOTION FOR RECONSIDERATION OF CONFIRMATION ORDER

Michael Ekberg ("Claimant") respectfully moves, pursuant to Rule 59(e) of the Federal Rules of Civil Procedure and Bankruptcy 9023, for reconsideration of the Court's Order confirming the Chapter 11 plans in the above matter (DKT. # 397). In support of the motion, the Claimant states as follows:

1. Claimant joins in whole or in part the claims and statements of fact of the MOTION FOR RECONSIDERATION OF CONFIRMATION ORDER filed by James R. MacAyeal ("MacAyeal"), before this court, on February 10, 2020. The MacAyeal claims included herein are 1 through 4.

In Addition:

2. The Claimant is a holder of tens of thousands of Series A, B and C preferred shares and common shares of debtor RAIT Financial Trust. This holding comprised a large portion of his retirement savings.

The Claimant respectfully requests the Court to find:

1. Fortress Investments, LLC ("Buyer") as an insider within the meaning of the U.S. Securities Laws.

2. Debtor has made preferential and fraudulent transfers both directly to Buyer, and for which Buyer has facilitated to Buyer's own benefit, to the detriment of all other of Debtor's preferred stock holders during the statutory periods.

Accordingly, Claimant respectfully asks the Court to clawback the assets and funds from Buyer and the third party beneficiaries of such transfers, unwind all of ARS and RAIT transaction, finding all the RAIT Series D preferred share redemptions as detrimental to all other Series A, B, and C preferred shareholders, and equitably distribute the assets and funds to all preferred stockholders

Claimant respectfully requests the court to cancel the Buyer's bid, and appoint a neutral party to take receivership of RAIT assets, and either seek a new buyer or just 'runoff' the assets to pay off shareholders.

## INTRODUCTION

The Buyer has a significant ownership interest in Melody RE II, LLC ("Melody the FL Purchaser" or "Melody"). The individuals working for Buyer on the RAIT deal, had a prior relationship with one or more of the founders of Melody when those founders were working at UBS. In June 2018, approximately nine (9) months before Buyer started negotiating the RAIT Section 363 buyout, Buyer through Melody negotiated a sweet deal with RAIT during the bankruptcy statutory lookback periods. The transaction benefited Buyer as well as favoring the Series D shareholder, all to the detriment of all other shareholders. There is sufficient evidence that Buyer acquired inside information about RAIT through this deal that has further caused detriment to RAIT shareholders by forcing RAIT into bankruptcy, with a plan that excludes the Preferred Shareholders, funneling that money back into Buyer. This Court should prevent such self-dealing and grant Claimant's requests.

## FACTS

Melody Capital Partners was founded by three UBS Bank employees. According to FineWs.ch, a Swiss financial website, the investment company Melody Capital Partners was founded by Cesar Gueikian, the former head of the UBS Special Situations Group, a profitable investment banking

branch of the large bank.. From his position at UBS, Gueikian knew the other two Melody co-founders Andres Scaminaci and Omar Jaffrey .

German newspaper "*Die Welt*" reported that, according to a presentation to investors, the former UBS bankers planned to use their fund to issue secured loans in North America and Western Europe.. Fortress Investment Group (Buyer) had already provided $ 100 million as an initial investment in their fund. The three bankers planned to raise a total of $500 million for the launch of the fund. See https://www.finews.ch/news/banken/12357-ubs-cesar-gueikian-sndres-scaminaci-omar-jaffrey-melody-capital

In June 2018, RAIT conducted an intricate and complicated transaction with Melody and , Almanac Realty Securities ("ARS") VI Investor , owner of the then current outstanding RAIT preferred D Shares ( "D Shares Owner"). In this transaction, RAIT sold at a discount to Melody interests that RAIT had in FL5 and FL6 VIEs for $54.8MM. RAIT's original investment in FL5 and FL6 was $62.8MM. By doing so, RAIT de-consolidated these entities from its balance sheet (as RAIT was no longer the primary beneficiary) and booked an $8.2MM loss on the transaction. Melody (and consequently, Buyer, holding at least 20 percent of Melody) , in contrast,  benefited from the transaction by a $8.2MM gain.

RAIT then issued new shares of already existing Series A, B, and C RAIT preferred shares valued at of $16.7MM, with a liquidation preference (face value), and used the $54.6MM obtained from the sale of FL5 and FL6 to bring the transaction total to $71.3MM, to redeem the remaining series D shares series from the D Shares Owner. This resulted in all the Preferred D Shares being redeemed and cancelled. The result was that, while $78MM D Shares were outstanding at year-end 2017, there were no D Shares outstanding by the end of 2018. This reduced RAIT's net assets by $62.8MM, eliminated the D Shares series and resulted in a dilution of the RAIT Series A, B, and C preferred shares. The D Shares Owner, accordingly benefited, as it lost less than 10 percent of the value of its investment by the transaction.

Moreover, Buyer was not merely an investor in Melody, it was an active participant in facilitating Melody's deals. To demonstrate the continuing close working relationship between Melody and Buyer, the following excerpt is an example of their collaboration in the matter of the bankruptcy of LIGHTSQUARED INC., et al., Debtors. Chapter 11, Case No. 12-12080 (SCC), Jointly Administered ("Lightsquared"). In that case, Buyer and Melody maneuvered a similar plan and buyout.

> "Before the Court is the Debtors' Third Amended Joint Plan Pursuant to Chapter 11 of Bankruptcy Code [Docket No. 1308] (as amended, supplemented, or modified in accordance with the terms thereof, the "Third Amended Plan" or the "Plan"). The Plan enjoys the support of every significant party in interest in these cases, save one: SPSO, a special purpose entity owned and controlled by Mr. Charles Ergen." (Mr. Charles Ergen is principle stockholder and CEO of DISH Networks.)
>
> "The Plan has the affirmative support of (a) Fortress Investment Group, on behalf of its affiliates' funds and/or managed accounts ("Fortress"), (b) Melody Capital Advisors, LLC and/or Melody NewCo, LLC, each of behalf of itself and its funds ("Melody"), (c) Harbinger, (d) JP Morgan Chase & Co. or its designated affiliates ("JPMorgan," and, collectively with Fortress, Melody, and Harbinger, the "Plan Support Parties"), (e) U.S. Bank National Association of ("U.S. Bank") and MAST Capital Management, LLC ("MAST"), and (f) the Ad Hoc Secured Group of Prepetition LightSquared LP Lenders (the "Ad Hoc Secured Group")." page 7

In addition, as part of the sale of RAIT's F5 and F6 assets to Melody, in which Buyer participated, Melody likely sought and learned many details of the inner workings of RAIT, an extremely complicated financially structured company. Note the sheer number of RAIT-named entities in the present docket. Undoubtedly, RAIT was involved in very complicated financial transactions, as evidenced by the number of intra-corporate transactions that are part of this docket. Melody would

have needed a lot of inside information from RAIT, much of which is non-public, in order to protect its investment in F5 and F6.

Given the entanglement between Melody and Buyer, it is apparent that much of this inside information was shared between Melody and Buyer, thus giving Buyer insider knowledge about RAIT, significantly before any other possible auction participants. Indeed, it appears that in depth discussions between RAIT and Fortress/Melody began before the June 2018 transactions, well before the March 2019 agreement.

That the gathering of inside information is the modus operandi of Melody was revealed in the LightSquared Bankruptcy. There insider information was acquired by Melody principals before formulating their plan for the debtor. "Called by SPSO, Mr. Falcone testified about his intimate involvement in the formulation of the Plan, detailing his discussions with Mr. Jaffrey of Melody, Mr. McKnight of Fortress, and others." LightSquared, supra page 23. No one has answered whether there were similar discussions about RAIT between Mr Omar Jaffray of Melody and Mr. Drew McKinight of Fortress during the statutory periods, that would have benefited Buyer to the detriment of other shareholders.

ARS, also was a potential source of information for Buyer, as ARS had gotten a board seat on RAIT as a result of the original transaction involving the original issuance of RAIT series D preferred shares. (The board seat was given up in 2018 as part of the settlement of the RAIT Series D buyback).

In 2008, ARS entity Metrogate was sued by Taberna, a subsidiary of RAIT. At the time, certain minority shareholders filed an action against Metrogate in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court" case) asserting causes of action in connection with the reorganization of Metrogate in 2008 (the "Conversion Agreement") for: (i) breach of fiduciary duty; (ii) breach of the implied covenant of good faith and fair dealing, fraudulent inducement, civil conspiracy; and (iii) aiding and abetting breach of fiduciary duty. The Funds had a limited intervention in the

Delaware State Court Action. After trial, the Delaware Court found that there were no damages as, **despite self-dealing by the board**, the equity value improved, and so dismissed the claims."

Metrogate, LLC was a Delaware LLC formed on July 1, 2001 for the purpose of buying, leasing, developing, selling, and investing in residential real estate. Metrogate is owned as follows: 88.5%—Almanac Realty Securities III, LLC ("ARS"); 8.9%—ELD Partners LP; 1.3%—Gary Sopko; and 1.3%—Nick Stathakis. Metrogate's board of directors is comprised of two representatives of ARS, D. Pike Aloian and John D. McGurk, and one representative of Advance Capital Partners LLC ("ACP"), Peter J. Cocoziello. Mr. McGurk is also the Vice President and Secretary of Metrogate, LLC.

Use of such information from ARS by Buyer, derived from ARS board membership, would have to be considered inside information.

Given the facts above, it is not a stretch of the imagination to conclude that the effect of ARS buying into RAIT in 2012 and concerned that it's investment was going down the tubes in 2018, was to force RAIT to buy out ARS's investment through threat of lawsuit to block critical asset sales, and RAIT-- using what it knows will soon be worthless Series A, B, and C preferred shares when it completes the transaction, because RAIT knows it does not have the assets to pay off the other holders of Series A, B, and C shares—provides ARS with the means to flip their newly issued, diluted Series A, B, and C shares, thereby defrauding shareholders by inducing an unsuspecting public to pay for the rest of ARS failed investment (it's 9 percent loss). (see attached letter). As part of this process, ARS forces out long-time CEO Scott Davidson and RAIT Chief Compliance Officer Glen Riis. And RAIT agrees to buy back $20,000,000 of worthless stock warrants from ARS, in addition to the $100,000,000 face value of Series D preferred that RAIT redeems from ARS, in addition to all of the interest on those preferred shares

In addition, I would not be totally shocked to find that at least parts of FL5 and FL6 were transferred or will be transferred to Buyer by Melody.

Ironically, Buyer seemed to have learned something from the LightSquared litigation.

"The facts and circumstances surrounding SPSO's acquisition of its claim (the "SPSO Claim"), and the conduct of Mr. Ergen and certain of his affiliated entities in these cases, are the subject of a separate adversary proceeding pending in this Court and are also at issue in connection with consideration of confirmation of the Plan." page 1.

"On August 6, 2013, Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger") commenced the Adversary Proceeding against Charles Ergen, DISH Network Corporation ("DISH"), EchoStar Corporation ("EchoStar"), L-Band Acquisition, LLC ("LBAC"), SP Special Opportunities LLC ("SPSO"), Special Opportunities Holdings LLC, Sound Point Capital Management LP, and Stephen Ketchum, alleging inequitable conduct, fraud, aiding and abetting fraud, tortious interference with prospective economic advantage, tortious interference with contractual relationship, unfair competition, and civil conspiracy; and seeking equitable disallowance of claims, compensatory and punitive damages, costs and fees, interest, and other appropriate relief. After the Court granted motions to dismiss Harbinger's complaint, LightSquared filed a Complaint-in-Intervention against SPSO, DISH, EchoStar, and Mr. Ergen, and Harbinger filed a second amended complaint. A trial in the Adversary Proceeding was held between January 9 and 17, 2014, with closing arguments held on March 17, 2014. This Court issued a bench decision on May 8, 2014, which was superseded by its Post-Trial Findings of Fact and Conclusions of Law, dated June 10, 2014 (the "Adversary Proceeding Decision"). Page 3 and 4.

"Conf. Hr'g Tr. Mar. 27, 2014 (Zelin) at 21:13-23:1 ("My reaction was that a bidder in a process demanding that information that they uncover that they think are issues that other bidders should know is quite strange. I've never experienced that before.") The Debtors and the Special Committee canceled the December 11, 2013 Court-scheduled auction for LightSquared's assets (or any grouping or subset thereof), and they did not deem any bid the "Successful Bid." See

Specific Disclosure Statement at 3. On January 7, 2014, LBAC, through its counsel, sent the Ad Hoc Secured Group written notice of LBAC's termination of the Plan Support Agreement and subsequently informed the Ad Hoc Secured Group of the termination of the DISH/LBAC Bid. See id. at 4. On January 13, 2014, the Ad Hoc Secured Group filed the Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan for LightSquared LP, ATC Technologies, LLC, LightSquared Corp., LightSquared Inc. of Virginia, LightSquared Subsidiary LLC, LightSquared Finance Co., LightSquared Network LLC, LightSquared Bermuda Ltd., SkyTerra Holdings (Canada) Inc., and SkyTerra (Canada) Inc., Proposed by the Ad Hoc Secured Group of LightSquared LP Lenders [Docket No.1220], in which the Ad Hoc Secured Group challenged LBAC's termination of the DISH/LBAC Bid (the "Ad Hoc Secured Group Motion to Enforce"). LBAC then sought a declaratory judgment "declaring that both the PSA and LBAC Bid were terminated in their entirety on or before January 10, 2014." See Objection of L-Band Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief, dated January 16, 2014 [Docket No. 1232] at 18; Reply in Further Support of Objection of L-Band Acquisition, LLC to the January 13, 2014 Statement of the Ad Hoc Secured Group of LightSquared LP Lenders and Notice of Intent To Proceed with Confirmation of the First Amended Joint Chapter 11 Plan and Motion for Declaratory Relief, dated January 21, 2014 [Docket No. 1246]. On January 22, 2014, this Court issued a ruling that the Plan Support Agreement and the DISH/LBAC Bid were lawfully terminated by LBAC. See Jan. 22, 2014 Hr'g Tr. [Docket No. 1278]. Note 27, page 19.

Basically, Buyer et al was complaining that Mr. Charles Ergen had prepared a high stalking horse bid for LightSquared at the bankruptcy auction, then when no one else tendered a bid, Mr. Ergen

claimed that due to a technical issue, he would withdraw the offer, and then subsequently re-submitted a lower bid. This is similar behavior to Buyer's bids for RAIT.

**ARGUMENT**

As noted in Klein and Coffee: directors and officers are treated as being in a fiduciary duty relationship to preferred shareholders. Clearly the bailing out of ARS by RAIT was detrimental to the interests of all other Series A, B, and C preferred shareholders. Particularly because within nine months of that action, and perhaps earlier, RAIT management was in discussion with the Buyer to put RAIT into bankruptcy.

RAIT board seems to have acted in a manner contrary to the fiduciary interests of shareholders by rushing into a flawed auction, giving undue influence to Buyer with inside information, or at least a much longer lead time in analyzing a very complicated entity like RAIT, advantaging Buyer over other potential bidders. In addition, the board seems to have cavalierly ignored a higher bid from other bidder, nor did RAIT actively seek other bidders.

As an insider, or if it possessed knowledge of RAIT Board deliberations, than the onus would be on Buyer to prove that the sale was indeed fair, rather than requiring other parties to prove fairness. A determination that Buyer was an insider has important implications. If for example, ARS, through the RAIT board membership of ARS partner Silberstein, was aware that RAIT was effectively bankrupt in June 2018, or that it was aware of discussions of or suggested a forced RAIT bankruptcy, this would reset the a potentially fraudulent conveyance timeline to the date of that knowledge, and would affect the ability of the court to unwind older transactions (Greyer v. Ingersoll 621 A 2d 748 (Del. Ch. 1992)) where the fact of insolvency rather than commencement of statutory proceedings triggers fiduciary obligations to creditors.

There may be standstill or like a priori agreements outside of the bankruptcy court between Melody, Buyer, and/or ARS, or individuals associated with these entities, which might serve to reduce competition for a successful bid during the asset auction. For instance, if Buyer offered rewards or

assets at reduced prices to either ARS, or Melody, that could be considered interference in what is presumed to be a 'fair' auction. Or perhaps these entities and/or individuals have been offered buyouts of essentially now worthless securities, in preference to other shareholders. Melody is probably too small to purchase RAIT assets, but that is not a problem for ARS.

Finally, since RAIT appears to have halted asset sales despite its public promise to continue that effort, it would seem the effective date of bankruptcy for the purpose of fraudulent conveyance would begin at least in March 2018, the date of the agreement between RAIT and Buyer, and perhaps before then., say at the start of discussions with Buyer about forced bankruptcy and/or cessation of asset sale.

## CONCLUSION

For the foregoing reasons, Claimant respectfully requests the unwinding of ARS and RAIT transaction, finding all the RAIT Series D preferred share redemptions as detrimental to all other Series A, B, and C preferred shareholders.

Claimant respectfully requests the court to cancel the Buyer's bid, and appoint a neutral party to take receivership of RAIT assets, and either seek a new buyer or just 'runoff' the assets to pay off shareholders.

DATED: February 27, 2020

Respectfully Submitted by Claimant

Michael Ekberg

1727 Page St

San Francsico, CA 94117

//s Michael Ekberg

--------------------------------------

from: https://www.sec.gov/Archives/edgar/data/0001045425/000156459018006057/ras-ex10145_500.htm

**Exhibit 10.14.5**

EXECUTION COPY

EXTENSION AGREEMENT

This EXTENSION AGREEMENT, made and entered into as of March 12, 2018 (this "Agreement") by and among ARS VI INVESTOR I, LP, a limited partnership formed and existing under the laws of the State of Delaware formerly known as ARS VI Investor I, LLC (the "Investor"), RAIT FINANCIAL TRUST, a real estate investment trust formed and existing under the laws of the State of Maryland (the "Company"), RAIT PARTNERSHIP, L.P., a limited partnership formed and existing under the laws of the State of Delaware (the "Partnership"), TABERNA REALTY FINANCE TRUST, a real estate investment trust formed and existing under the laws of the State of Maryland ("Taberna"), and RAIT ASSET HOLDINGS IV, LLC, a limited liability company formed and existing under the laws of the State of Delaware ("NewSub" and together with the Company, the Partnership and Taberna, the "Issuer Parties"), and relates to the Securities Purchase Agreement, dated as of October 1, 2012 by and among the Issuer Parties and the Investor, as amended by the Amendment thereto dated September 30, 2015 (as amended, the "Securities Purchase Agreement") and Related Documents. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Securities Purchase Agreement.

RECITALS

WHEREAS, by letter dated February 14, 2018 (the "February Letter"), the Investor formally notified the Company and NewSub of the existence of certain breaches under the Securities Purchase Agreement and Related Documents outlined in prior letters to the Company, and the Company and NewSub dispute the existence of such breaches;

WHEREAS, the Issuer Parties have requested that the Investor delay declaring the effectiveness of the alleged breaches specified in the February Letter to permit the parties additional time to engage in discussions concerning, among other things, the contents of the February Letter and the manner of repayment of the Series D Preferred Shares in redemption thereof (the "Redemption Transaction"); and

WHEREAS, Investor is willing to grant the Issuer Parties additional time to accomplish the Redemption Transaction, on the terms and conditions set forth below.

NOW, THEREFORE, for good and valuable consideration, including the extension provided for herein, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

Section 1. Extension Agreement.

a. Investor hereby agrees to extend the Effective Date (as defined in and set forth in the February ) Letter) to 6:00 p.m. (Eastern time) on Saturday, June 9, 2018 (such period being the "Extended

Effective Date Period") on the terms and conditions set forth below.

b.) The parties hereby agree as follows:

i. Any information that a special committee of the Company's independent trustees (the "Special Committee") delegated the authority by Company's Board of Trustees (the "Board"), the Company's executive officers and/or M-III Advisory Partners, LP ("M-III Partners") share with Investor or its representatives may be discussed freely with Andrew Silberstein, and so long as he does not reveal any other confidential information received in his capacity as a member of the Board, neither he nor Investor will be subject to the restrictions on confidentiality set forth in the policies of the Company's Board solely with respect to such information provided by the Special Committee, the Company's executive officers and/or M-III Partners. For the avoidance of doubt, any such information will remain subject to the confidentiality agreement between the Company and Investor dated February 22, 2018.

ii. During the Extended Effective Date Period, the Company shall provide Investor with (a) as promptly as possible upon Investor's written request, information relating to the assets (including any monthly reports relating thereto, if any) and liabilities of NewSub and its Subsidiaries and sales efforts with respect thereto and shall promptly notify the Investor in writing of any change in the assets or liabilities of NewSub and its Subsidiaries from and after the date hereof, and (b) access to M-III Partners as well as one or more members of the Company's executive management team and Special Committee for a one hour weekly conference call to discuss the Company's business, operations and financial conditions. Additionally, Investor may from time to time request access to private or confidential Board information, which in each case shall be reasonably considered in good faith by the Company. The Company expects to continue to provide such information to Investor unless it reasonably and in good faith deems the sharing of that information contrary to the Company's interest.

iii. During the Extended Effective Date Period, the Issuer Parties shall use reasonable best efforts to (a) enter into binding sale contracts by May 25, 2018 to sell certain specified assets of NewSub (individually "Specified Asset 1", "Specified Asset 2", and "Specified Asset 3" and collectively "Specified Assets") for cash payable in full at the closing, which contracts shall provide for a closing date of no later than July 1, 2018, (b) provide for a sale process designed to maximize the sales price of each of the Specified Assets, and (c) consummate the sale of each of the Specified Assets by no later than July 1, 2018. The Issuer Parties shall keep the Investor reasonably informed of the status of the sale process of each of the Specified Assets, including by providing the Investor periodic updates on the current status thereof and providing such other information with respect to such sales as the Investor may reasonably request from time to time. To the extent necessary, any sale of the Specified Assets may be facilitated by transferring such asset to a Subsidiary of NewSub and, with the Investor's prior written consent (which consent shall not be unreasonably withheld), to any other Affiliate of NewSub. Assuming the Company has declared and paid

dividends consistent with the terms and conditions of the Articles Supplementary of the Series D Preferred Shares, the Series C Preferred Shares, the Series B Preferred Shares and the Series A Preferred Shares, notwithstanding anything contained in the Securities Purchase Agreement or any Related Document, including, without limitation, Section 5(c) of Article Third of the Articles Supplementary and Article 5 and Article 11 of the LLC Agreement, any and all Net Proceeds (as defined in the Articles Supplementary and LLC Agreement) received by any Issuer Party in respect of the sale of the Specified Assets shall be used only to immediately redeem the Subsidiary Preferred Units and cancel the linked Series D Preferred Shares and for no other purpose.  Except as expressly set forth in this Section 1(b)(iii), neither NewSub nor any of its Subsidiaries shall, directly or indirectly, without Investor's prior written consent, transfer any of its assets to any Person which approval right shall only be applicable during the Extended Effective Date Period.

iv. Any sale of (a) Specified Asset 1 which results in Net Proceeds of less than the amount previously agreed by the parties and (b) Specified Asset 2 or Specified Asset 3 which results in Net Proceeds of less than the amounts previously agreed by the parties, which agreed upon amount is the par amount of each such asset, shall, in any such case, be approved in writing by the Investor in its sole discretion which approval right shall only be applicable during the Extended Effective Date Period.  For the avoidance of doubt, Investor hereby agrees that a price of 99.25% of par for Specified Asset 1 is acceptable and approved by Investor.  If any proposed sale of Specified Asset 2 and/or Specified Asset 3 is expected to result in Net Proceeds of less than the par amount of each such asset, the Investor shall have the right in its sole discretion to participate in any sales process or otherwise bid on either or both of such assets using the Series D Preferred Shares and Subsidiary Preferred Units as consideration therefor valued at the then current Liquidation Preference (as defined in the Articles Supplementary) thereof, and for avoidance of doubt, if the Investor utilizes the Series D Preferred Shares and Subsidiary Preferred Units as consideration for the purchase of Specified Asset 2 and/or Specified Asset 3, the calculations contained in this Section 1(b)(iv) shall not be affected or modified.  If any sale of Specified Asset 2 and/or Specified Asset 3 that results in Net Proceeds of less than the par amount of either such asset is so approved by the Investor, the aggregate amount of such Net Proceeds which is less than the aggregate par amount of Specified Asset 2 and Specified Asset 3 (if any) (any such amount, the "<u>Asset 2/3 Shortfall</u>") shall be added to $12,235,000 (which amount represents the current Liquidation Preference of the Series D Preferred Shares less an assumed amount of Net Proceeds to be received by the Investor in respect of the sale of Specified Asset 1, Specified Asset 2 and Specified Asset 3).  At such time that the aggregate Liquidation Preference of the Series D Preferred Shares is reduced to an amount equal to $12,235,000 plus the Asset 2/3 Shortfall, if any, such aggregate amount shall be converted into New Series D Shares

3

(as hereinafter defined), assuming the New Series D Shares have a liquidation preference of $25.00 per share (the aggregate liquidation preference on such date of the New Series D Shares, the "<u>New Series D Differential</u>").

v. On the date that Net Proceeds relating to Specified Asset 2 and Specified Asset 3 have been paid to the Investor and the Investor acquires the New Series D Shares, the Company shall pay the Investor

an amount in cash equal to 2.5% of the New Series D Differential subject to a maximum payment of $400,000 which payment shall be made on the same day as the conversion of the Series D Preferred Shares to the New Series D Shares as provided for herein.

vi. From and after the date such Net Proceeds relating to Specified Asset 2 and Specified Asset 3 have been paid to the Investor, (a) for no further consideration other than the parties providing reasonably acceptable mutual releases, NewSub shall have the right to unilaterally redeem all of the outstanding Subsidiary Preferred Units and at such time the Company shall cancel Series D Preferred Shares having a Liquidation Preference equal to the Net Proceeds received by the Investor (if and to the extent not previously cancelled), (b) the Investor shall no longer have the right to appoint an Investor Board Designee pursuant to the Securities Purchase Agreement and Related Documents, (c) the existing Investor Board Designee shall immediately tender to the Company his resignation from the Board subject to the receipt of a release from the Issuer Parties reasonably acceptable to Investor, (d) the Investor shall request in writing that the other member of the Board affiliated with the Investor tender to the Company his resignation from the Board subject to the receipt of a release from the Issuer Parties reasonably acceptable to him, and (e) the Securities Purchase Agreement, the Articles Supplementary and any other Related Document shall be terminated and/or amended, as applicable, such that the remaining outstanding Series D Preferred Shares ("New Series D Shares") are on substantially equivalent terms as the Series A Preferred Shares, the Series B Preferred Shares and the Series C Preferred Shares other than the Applicable Dividend Rate (as defined in the Articles Supplementary) for the Series D Preferred Shares shall continue to be the Applicable Dividend Rate then in effect under the related Articles Supplementary and the Investor shall receive New Series D Shares with an aggregate liquidation preference equal to the New Series D Differential.

vii. Provided that the extension set forth in Section 1 hereof is not terminated as a result of the terms of Section 1(c)(vi), without limiting the Investor's rights under the Securities Purchase Agreement or Related Documents, within three business days of the execution of this Agreement and delivery to the Company of invoices in respect of the documented legal and other costs incurred by the Investor and its Affiliates with respect to the execution of this Agreement, the Company shall pay the Investor $130,000.

4

c. Immediately upon the occurrence of any of the following events, the extension set forth in Section 1 ) hereof shall automatically be revoked if:

i. Any of the Issuer Parties or any Subsidiary of NewSub shall, pursuant to or within the meaning of the United States Bankruptcy Code or any other foreign, federal or state law relating to insolvency or relief of debtors (a "Bankruptcy Law") (1) commence a voluntary case or proceeding, (2) consent to the entry of an order for relief against it in an involuntary case, (3) consent to the appointment of a trustee, receiver, assignee, liquidator or similar official or (4) make an assignment of all or substantially all of its assets for the benefit of its creditors;

ii. a court of competent jurisdiction shall enter an order or decree under any Bankruptcy Law that (1) is for relief against any Issuer Party or any Subsidiary of NewSub in an involuntary case, (2) appoints

a trustee, receiver, assignee, liquidator or similar official for an Issuer Party or any Subsidiary of NewSub or substantially all of an Issuer Party's or any Subsidiary of NewSub's assets or (3) orders the liquidation of an Issuer Party or any Subsidiary of NewSub, and in each case, the order or decree is not dismissed within sixty days;

iii. without Investor's prior written consent (which consent shall not be unreasonably withheld), NewSub or any of its Subsidiaries, (1) directly or indirectly transfers any of its assets to any Person, other than in connection with the sale of the Specified Assets to an unaffiliated third party as permitted by the Securities Purchase Agreement or any Related Document (which, to the extent necessary, may be facilitated by transferring such asset to a Subsidiary of NewSub and, with the Investor's prior written consent (which consent shall not be unreasonably withheld) to any other Affiliate of NewSub) which results in the generation of Net Proceeds and is otherwise in compliance with Section 1(b)(iii) and Section 1(b)(iv) hereof or (2) accepts, purchases or otherwise obtains any additional assets not owned by NewSub or its Subsidiaries on the date hereof;

iv. without Investor's prior written consent, NewSub or any of its Subsidiaries directly or indirectly incurs any indebtedness, other than any such indebtedness in the ordinary course of business that is required to be incurred in connection with the generation of Net Proceeds pursuant to the terms of this Agreement;

v. upon the occurrence of (a) a Draw Down Termination Event under the Securities Purchase Agreement or a Mandatory Redemption Triggering Event under the Articles Supplementary (after giving effect to the terms of this Agreement) (excluding, for the avoidance of doubt, the alleged breaches expressly set forth in the February Letter), or (b) any breach of any covenant, agreement, representation or warranty contained in this Agreement, other than an inadvertent immaterial breach that does not impede, hinder or delay the Issuer Parties' ability to consummate the Redemption Transaction in accordance with the terms of this Agreement;

5

vi. the Board shall not approve the payment of dividends with respect to the Company's issued and outstanding Series D Preferred Shares, Series C Preferred Shares, Series B Preferred Shares and Series A Preferred Shares at its March 13, 2018 meeting in an aggregate amount to bring each of the Company's outstanding Preferred Shares current with respect to the payment of dividends. For the avoidance of doubt, any dividend payment to the Investor from and after the date of this Agreement shall not reduce the Liquidation Preference of the Series D Preferred Shares under the Articles Supplementary; or

vii. in the event the Board approves the payment of the above described dividends in said amount as set forth in subclause (vi) above, the Company has not, within five business days of the approval thereof, deposited the aggregate amount of such dividends in a segregated account of the Company and maintain such funds in said account until paid.

Section 2. <u>Exercise of Rights and Remedies With Respect to a Delisting.</u> During the Extended Effective Date Period, the Investor shall refrain from exercising any of its rights and remedies

contained in the Securities Purchase Agreement and the Related Documents solely as they relate to the Company's failure to maintain any of the Company's securities on a Trading Market.

Section 3. <u>Set Apart of Dividends</u>. If the dividend contemplated by Section 1(c)(vi) above is declared, the Company hereby "sets apart" the dividend within the meaning of the Articles Supplementary of the Series A Preferred Stock, the Articles Supplementary of the Series B Preferred Stock, the Articles Supplementary of the Series C Preferred Stock and the Articles Supplementary of the Series D Preferred Stock. Additionally, if the dividend contemplated by Section 1(c)(vi) is declared, (a) the Company will include or enter the amounts of such dividend as items in the Company's accounting records or other internal accounting or financial documents or records and (b) the chief financial officer or other appropriate officer of the Company will enter such dividend in a cash flow schedule of the Company.

Section 4. Representations and Warranties. In order to induce the Investor to execute this Agreement, the Issuer Parties hereby represent and warrant to the Investor as follows:

a.) The execution, delivery and performance by the Issuer Parties of this Agreement have been duly authorized by all necessary organizational action on the part of each such Issuer Party (including, without limitation, the Board, the general partner of the Partnership, the manager of NewSub and the Board of Trustees of Taberna) and do not require any consent or approval of, or notice to or action by, any other Person (including any governmental authority).

b.) This Agreement has been duly executed and delivered by each of the Issuer Parties and constitutes a valid and binding obligation of each Issuer Party enforceable against it in accordance with its terms.

c.) Neither the execution, delivery or performance by any Issuer Party of this

6

Agreement nor the consummation by the Issuer Parties of the transactions contemplated hereby will (i) conflict with or result in any breach of any provision of the Organizational Documents of any Issuer Party (except that the LLC Agreement is modified by the terms of this Agreement), (ii) result in a violation or breach of, or constitute (with or without due notice or lapse of time or both) a default or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any contract, agreement, commitment, lease, license, loan or other arrangement or understanding to which any Issuer Party is a party, or (iii) violate any Law of any governmental authority having jurisdiction over any Issuer Party or any of their respective properties or assets.

Section 5. No Further Waiver. Except as otherwise contemplated by this Agreement, all provisions of the Securities Purchase Agreement and the Related Documents shall remain in full force and effect.

Section 6. Headings. The article, section and subsection headings in this Agreement are for convenience only and shall not constitute a part of this Agreement for any other purpose and shall not be deemed to limit or affect any of the provisions hereof.

Section 7. Governing Law. This Agreement shall be governed by and construed in accordance with the internal procedural and substantive laws of the State of New York, without giving effect to the choice of law provisions of such state that would cause the application of the laws of any other jurisdiction.

Section 8. Counterparts. This Agreement may be executed in one or more counterparts (including by facsimile or other electronic transmission), all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties (including by facsimile or other electronic transmission).

Section 9. Related Documents. This Agreement shall for all purposes constitute a Related Document.

Section 10. No Prejudice. Each of the parties hereto acknowledges that although there have been prior discussions, and it is intended that there will be further discussions, between the parties concerning the alleged defaults under the Securities Purchase Agreement, there are no oral agreements between Investor, on the one hand, and any Issuer Party, on the other hand, with respect to the Redemption Transaction. The parties agree that any past communications or future communications relating to the Redemption Transaction between Investor, on the one hand, and the Issuer Parties, the Special Committee or M-III Partners, on the other hand, or any of their respective Representatives shall be on a "without prejudice" basis, meaning any settlement proposal or offer by any party hereto may not be used against such party by a counterparty in any subsequent litigation. The parties hereto agree that their communications shall be protected by Federal Rule of Evidence 408. Investor and each of the Issuer Parties acknowledge that the negotiations relating to a Redemption Transaction may be lengthy and complex, and that during the course of such discussions any party may put forth suggestions that are not intended to

constitute binding offers of any kind, but represent merely exploratory suggestions by the party presenting them.

Section 11. Issuer Parties'/Investor's Rights Not Affected. The entering into of this Agreement by the Issuer Parties and the Investor shall not be deemed a waiver or limitation of, and is without prejudice to, any right or remedy of any of the Issuer Parties or the Investor under the Securities Purchase Agreement and the Related Documents, at law and/or in equity, and reservation is hereby made on such parties' behalf of all such rights and remedies and to assert their respective rights and remedies applicable to any other matters which are not described in this Agreement. Nothing contained in this Agreement shall constitute an admission as to whether there has been a breach of any of the terms of the Securities Purchase Agreement or any Related Document, or otherwise prejudice any of any party's rights and remedies.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officer as of the date first above written.

COMPANY:

RAIT FINANCIAL TRUST

By: /s/ John J. Reyle
Name: John J. Reyle
Title: Interim Chief Executive Officer, Interim President & General Counsel

PARTNERSHIP:

RAIT PARTNERSHIP, L.P.

By: RAIT General, Inc., a Maryland corporation, its General Partner

By: /s/ John J. Reyle
Name: John J. Reyle
Title: Interim Chief Executive Officer, Interim President & General Counsel

TABERNA:

TABERNA REALTY FINANCE TRUST

By: /s/ John J. Reyle
Name: John J. Reyle
Title: Interim Chief Executive Officer, Interim President & General Counsel

9

NEWSUB:

RAIT Asset Holdings IV, LLC,
a Delaware limited liability company


By: RAIT Partnership, L.P., a Delaware limited partnership,
its sole member


By: RAIT General, Inc., a Maryland corporation, its General Partner


By: /s/ John J. Reyle
Name: John J. Reyle
Title: Interim Chief Executive Officer, Interim President & General Counsel



INVESTOR:

ARS VI INVESTOR I, LP

By:  ARS VI Investor IGP,

   LLC, its General Partner

By:  Almanac Realty Securities VI,

   L.P., its Sole Member

By:  Almanac Realty Partners VI,

   LLC, its General Partner


By: /s/ Matthew W. Kaplan
Name: Matthew W. Kaplan
Title: President